HAYS *v.* LYON.

(In Banc. April 13, 1942.)

[7 So. (2d) 523. No. 34930.]

Wynn, Hafter & Lake and Chas. S. Tindall, Jr., all of Greenville, and **Fred B. Smith,** of Ripley, for appellant.

Moody & Davis, of Indianola, for appellee.

Argued orally by **Chas. S. Tindall, Jr.,** and **Fred B. Smith,** for appellant, and by **Jefferson Davis,** for appellee.

**Griffith, J.,** delivered the opinion of the court.

The parties are the owners of adjoining lands. Appellant Hays owns Section 11 and appellee Lyon owns Section 12. The southwest corner of Section 12, known as the "Bamboo Corner," is not in dispute. The controversy had its origin in a difference of opinion as to the true location of the northwest corner of Section 12. Upon this issue six surveyors testified. The original government witness trees for this corner are gone, and have been for a long time. The fifth mile post on the north township line, as located by the original government survey, is definitely proved, and appears not to be anywise in substantial dispute; and Lyon maintained that the true location for the northwest corner of Section 12 is found by beginning at this fifth mile post on the north township line, as, according to his field notes, the government surveyor did in making the original survey, and running south 80 chains as he did, when by so doing the southwest corner of Section 1, which would be at the same time the northwest corner of Section 12, is found to correspond with the fence corner which has been for many years generally recognized in that community as the actual location of that government corner. We will hereafter speak of this corner as the "Fence Corner."

Hays contends that, inasmuch as the Bamboo Corner is not in dispute, the correct method by which to ascertain the dividing line between the sections is to run one mile due north from the Bamboo Corner, although when so done this would place the northwest corner of Section 12 about 6½ chains to the east of the Fence Corner. He contends also that this would tie in with the township line to the east as originally located on the ground, but about which some uncertainty is disclosed, and also with certain generally recognized corners to the west. There is no

real contention between the parties upon the proposition that when the true location of the northwest corner of Section 12 is determined, then a straight line from that point to the Bamboo Corner is the dividing line between the two sections here involved.

About twenty-five years ago Holt, who then owned Section 12, decided to fence in his entire section on the boundary lines thereof and for his fence line on the west, which divides the two sections here in question, he built a substantial wire fence on a straight line from the Fence Corner to the Bamboo Corner, and this fence was maintained for more than ten years, and it remained in such condition, even up to the time of the purchase of Section 11 by Hays, as to be plainly observed by any person interested in or dealing with the land. About 1931, this line was further marked by ''Posted'' signs. And at this point we find it appropriate to say that this fence was erected on the true line between the sections, as the chancellor found on the facts, which finding we think is amply supported by the evidence.

And this renders it unnecessary to follow through whether Lyon had title by adverse possession as the chancellor also found. But this finding does bear upon the issue of the correct location of the true line in this: The stated finding imports the element, and to restate in other words what we have already mentioned, that the fence between Sections 11 and 12 was built on a straight line, was a substantial fence, and was maintained as such for more than a period of ten years from the time it was erected, about the year 1916. When it was built it adopted as its northwest corner the southwest corner of Section 1 which had been theretofore adopted, as the correct corner by line fences running north and east therefrom, by the owners of Sections 1 and 2 as evidenced by what they did on the ground and, as may be fairly presumed, when the witness trees for that corner were still there for their guidance. These witness trees are now gone, and the trier of the facts in adjudicating be-

tween conflicting modern surveys is justified in taking aid from fence locations of the character disclosed in this case when they have stood undisturbed long beyond the statutory period for adverse possession. And fence lines of that age and character stand as sentinels that he who crosses beyond does so at his peril. Compare what was said by COOLEY, J., in the leading case, Diehl v. Zanger, 39 Mich. 601.

Hays purchased Section 11 in January, 1934. The next year he employed Wilds, a surveyor, to run a line due north from the Bamboo corner for a distance of one mile, and a trail was blazed at the time along this survey. But the surveyor told Hays at the time that this blazed trail could not be depended on as the true line unless other lines by way of verification were run, but Hays did not heed this warning and have the other lines run. Mrs. Holt, who then owned Section 12, discovered within a few days that this trail had been blazed through her land, and thereupon personally, through her attorney, she notified Hays that this was considered by her as a trespass, and to make certain that this would not be left to the uncertainties of oral communication, the attorney wrote to Hays on July 12, 1935, a letter in which, among other language, this paragraph was written: "As a matter of fact, the West line of Mrs. Holt's property has been well established and defined by a wire fence which still exists and which has been there for a period of 15 or 20 years of which fact you are well aware." The receipt of this letter by Hays was proved.

There the matter rested until July 26, 1939, when Hays, through his attorneys, wrote the attorney for Mrs. Holt suggesting an adjustment about what he termed the disputed line, but the Holt land, Section 12, had been conveyed to Lyon on August 2, 1937. Some correspondence between Hays and Lyon followed the letter of July 26, 1939, but nothing resulted therefrom, and concluded with a letter from Lyon to Hays dated August 18, 1939, by which, in effect, Lyon stood firmly upon the fenced

boundary line which he and the Holts had all along asserted.

In August, 1940, Hays had the trail north from the Bamboo corner blazed again, and soon thereafter Lyon learned that a number of persons were cutting the timber to the east of the wire fence and up towards the blazed trail. Lyon went immediately to the scene, and being informed that these persons, or some of them, were acting under the direction of Lunceford, who was Hays' manager in charge of Section 11, Lyon then at once saw Lunceford and inquired of him as to who were the persons engaged in cutting this timber, to which Lunceford replied that Lyon did not have to concern himself about who they were, since they were all working for Hays under Lunceford's supervision and that they would stop when he, Lunceford, told them to stop, and Lunceford further stated that he was clearing the land as far east as the blazed trail under Hays' directions so to do, and when his attention was called to the line fence which was being torn down in this work, Lunceford replied that he didn't give a damn about the fence.

In order to be left in no doubt about Lunceford's authority and directions to act as aforesaid in Hays' place and stead, Lyon went then to a telephone and notified Hays of what he had seen and heard, and made inquiry direct of Hays himself and was told by Hays that what had been done and was being done by Lunceford was at Hays' direction, and Lyon was further told by Hays to stay off any part of the land west of the blazed trail. The next day Lunceford saw Hays, and he received such directions that when Lyon appeared later in the day on the strip in question, Lunceford told him to get back to the east of the blazed trail.

What has been stated in the two preceding paragraphs occurred in August, 1940. The suit to recover for the trespass was filed August 30, 1940. Hays testified that some month or so before he sent Lunceford to do the cutting, he had procured Clark, a surveyor, to make a

complete survey, and that this survey corresponded as to the west line with the partial survey made by Wilds in 1935. And much has been said by Hays in his briefs about his good faith in his reliance on this Clark survey. Of this it is enough to observe that in his first answer on his cross-examination, Clark says he made this survey on September 17, 1940, by which he perhaps meant September 7, 1940, since his map is dated September 8, 1940. In either event the Clark survey was not made until after the trespass had been committed.

All that has been above stated finds substantial support in the evidence and, although disputed in many particulars, was within the province of the chancellor to find as the facts, and being supported by substantial evidence, we must accept the facts as the chancellor by virtue of his decree has found them to be. And this presents the question whether under the law the chancellor was correct in awarding the statutory penalty for the cutting of the trees.

In Seward v. West, 168 Miss. 376, 150 So. 364, 366, the court, after a review of previous cases, concluded with a summary of the rule applicable to civil cases involving the statutory penalty for cutting trees, using the language as follows: "Without unduly extending comment, we add by way of summary that this court has always been cautious in the infliction of the statutory penalty, and will allow it only where the facts are well proved and where the testimony shows the trespass to have been wilful, or the negligence so gross, or the indifference so real, or the lack of good faith so evident, as to be tantamount to willfulness." This is the rule, and the difficulty is not in its contents but in applying the facts, as to whether within or without it, as each case arises, of which a recent difficult example was furnished in E. L. Bruce Co. v. Edwards, 192 Miss. 1, 3 So. (2d) 846.

The question then in this case is: Do the facts well proved and cautiously applied show that, on the part of the person charged with the trespass, the indifference

was so real as to amount to wilfulness? We agree with the chancellor that this question, under the facts as found by him, was properly answered in the affirmative. The chancellor was justified in holding, as was the effect of his conclusions, that the attitude of appellant was aptly characterized by the classical language of his agent in charge, heretofore quoted, in expressing his entire indifference about the fence and the line so long well defined by it, whereupon he took the risk, under the penalties provided by law, consequent upon the ultimate determination of the true line. There is too much of danger in the possibility that conduct, such as this case definitely presents, might be met with violence or breaches of the peace for the law to look upon it with the tolerance which appellant so earnestly invokes.

The decree of the chancellor is sufficiently well supported as to the number and kind of the trees for which he awarded the penalty. On that issue the more serious question, presented by the cross-appeal, is whether he should have found for a greater number than he did, and as the evidence strongly indicates he might well have done. We are not able to say, however, that in that respect his finding was manifestly wrong, wherefore upon that point, also, his conclusion must be accepted by us as correct.

Affirmed on direct and on cross-appeal.