TEAGUE *v.* BROWN *et al.*

(In Banc. Feb. 11, 1946.)

[24 So. (2d) 726. No. 36043.]

H. T. Leonard and D. H. Glass, both of Kosciusko, and Ross R. Barnett, of Jackson, for appellant.

Guyton & Allen, of Kosciusko, for appellees.

Argued orally by **Ross R. Barnett**, for appellant.

**L. A. Smith, Sr., J.**, delivered the opinion of the court.

In the Chancery Court of Attala County, Tinnie and Henry Brown, husband and wife, filed their original bill of complaint against Dan Teague praying for the cancellation of a deed of conveyance executed by them to the defendant April 5, 1941, and recorded the same day, on the ground that it was obtained by fraud, deceit and misrepresentation. One hundred and sixty acres of land in Attala County are involved. The learned chancellor entered a decree cancelling the deed because "Under the circumstances there was no meeting of the minds of the parties on April 5, 1941." From this decree, Dan Teague appealed.

The land involved had belonged to Dan's deceased father, who acquired it two years after the surrender at the end of the Civil War. Dan had lived on it in his early life. He owned some land adjoining it at the time of the trial, but had previously moved to the Delta where he had by hard work and providence accumulated some means. Simon Teague was the first husband of Tinnie Brown. He was also the nephew of Dan Teague, and had acquired the farm here involved, which he owned at his death in 1939, subject to a trust deed thereon to the Federal Land Bank securing the repayment of $700, in annual installments over an extended period of years. Simon and Tinnie had no children, and he died intestate, so that appellee

Tinnie Brown was his sole heir-at-law and inherited the place upon his death. About a year or two after the death of Simon Teague, Tinnie married Henry Brown, the other appellee, and they were occupying a house on the farm as their homestead when the events of this case occurred. However, they had permitted the place to run down, most of the fields formerly cultivated had been allowed to grow up in sedge grass, the ditches had become filled and the improvements were dilapidated. This led to lack of productivity, and soon Tinnie fell behind with her taxes and annual payments to the Federal Land Bank.

She appealed to Dan for assistance from time to time, and he responded until he had advanced her around $130. The last amount advanced was $59.30, at time when Mr. Carr, the representative of the Federal Land Bank, was pressing her for payment because the security of the debt was deteriorating and the installments were in arrears. In connection with the situation, Tinnie asked Dan, her uncle by marriage, as stated, for help. He came to Attala County, he says, when things had gotten so bad with Tinnie and her husband, Henry, and they were helpless to cope with their difficulties because she wrote him that she could not pay the debt. This was in 1940, and the installment due the Federal Land Bank was months past due. He also had a letter from Mr. Carr of the Federal Land Bank written February 18, 1941, at the instance of Tinnie, asking him to make an installment payment for Tinnie. On his subsequent arrival in Kosciusko, he and Tinnie went to the office of Mr. Carr in Kosciusko, who at the time of the trial was secretary-treasurer of the Lexington Corporation of the National Farm Loan Association, serving Holmes, Carroll, Leflore and Humphreys Counties, Mississippi. At the time of the events under discussion, he was secretary-treasurer of the Attala National Farm Loan Association, serving the Federal Land Bank in Attala County, field representative of the Federal Land Bank and agent of the Land Bank Commissioner. He obviously, held a most responsible position

in a very important activity of the United States Government.

In order to assist Tinnie, the Federal Land Bank had earlier reamortized the loan on the land. Before Dan's final trip to Kosciusko, he received the letter mentioned above from Mr. Carr, which stated, "Your niece Tinnie Teague told me that you are to be here in Kosciusko Saturday February 22nd, and that you would pay the insallment due on her loan." The principal purpose of their visit to the office of Mr. Carr was to learn if he had received the $59.30 sent by Dan, which he had. Then, Mr. Carr asked Tinnie if she would be able to keep up her payments and she said she would not. Mr. Carr thereupon told her the best thing for her to do was to sell the land to Dan and she agreed. Mr. Carr, in accordance with the rules of the Bank, wrote out an assumption agreement, whereby Dan assumed the payment of the indebtedness on the farm. In that instrument occurs the following clause "Whereas Dan Teague, hereinafter called the vendee, has purchased from Tinnie Teague, hereinafter called the vendor, the above mentioned land subject to said mortgage." The date of this instrument was April 5, 1941, and it was signed by both Tinnie and Dan, and witnessed by a Mr. George Townsend and Mr. Carr. Mr. Townsend did not testify because he was absent in the Army in Germany at the time of the trial. Dan says that Tinnie told Mr. Carr she would rather he would have it than for a stranger to get it.

We digress here long enough to mention that it had become rumored among the public that the land was going to be sold under foreclosure, and people had been looking at the farm with a view of purchasing it, among them was Mr. A A. Long, the Mayor of Sallis.

When this assumption agreement was executed, Mr. Carr told Tinnie and Dan that it was not a deed and that in order for the transfer to be legally effected they would have to obtain the services of a lawyer to prepare a deed for her to sign. Whereupon, they immediately went to the office of Mr. D. H. Glass, a member of the Attala

County Bar. Neither of them had been to Mr. Glass before in connection with this matter, and manifestly he knew nothing about it or their purpose except from what he learned from them. Tinnie was there to hear what Dan said, and Dan was there to hear what Tinnie said, and Mr. Glass was there to hear what both said. As a result of this conference, and pursuant to his employment, Mr. Glass went to the office of the chancery clerk to examine the title and obtain a description of the land. When he returned, they were still where he had left them. He prepared the deed, which was in consideration of $1 and the assumption by Dan Teague of all amounts due the Federal Land Bank of New Orleans on the land, to which reference was made by record book and page number in the deed. Dan paid the dollar and acquitted Tinnie of further liability to him for the $130, supra, and assumed the indebtedness to the Federal Land Bank, and these were the considerations for the conveyance. Tinnie also told Mrs. Glass in this conversation she wanted to deed the land to Dan because she could not pay it. Henry Brown, the husband of Tinnie, was not with them. Mr. Glass told Tinnie that Henry Brown, her husband, would have to sign the deed because the place was their homestead. She remonstrated that Henry had nothing to do with it, it was her property. However, upon being convinced that the transaction could not be legally completed without Henry's signature, she and Dan left and later Henry came and signed and acknowledged the deed before a notary public, whose office was down the hall from that of Mr. Glass. His name was Carballo. He did not testify at the trial, as he does not seem to have been available for some reason. Tinnie also acknowledged the deed before Mr. Carballo, whose certificate stated "that they signed and delivered the foregoing instrument, and at the time therein named as their act and deed."

Later, Dan told Tinnie that she and Henry could continue to live in the house just like other tenants as long as they treated him right. They, however, permitted the

farm to continue to be unproductive, and their payments thereafter to Dan were negligible until 1943 and 1944 when they increased somewhat. Dan testified that he rented the land to them for one-fourth of the cotton and one-third of the corn, and in this he was corroborated by Henry Brown, the husband of Tinnie. Tinnie was very vague in her statements as to what the small payments they made to Dan were to cover. They never did pay the full rentals. As time passed, Tinnie said that she had begun to hear reports in the neighborhood that Dan claimed that she had deeded the place to him, which she said was her first knowledge of it. Dan said that Tinnie wanted the house in which she and Henry were living to be reroofed, and from his failure to do so this lawsuit developed. The testimony of Dan Teague is corroborated in the record categorically by Mr. Carr, Mr. Glass, and is also supported by the certificate of acknowledgment of Mr. Carballo, as to the agreements between the parties, and the conveyance and assumption agreement.

Against this testimony is the testimony of Tinnie and her husband Henry, and a few of Tinnie's relatives and disgruntled kinspeople of Dan, who did not like him. We do not think the testimony of these people of sufficient weight to set out herein. The testimony of Henry Brown corroborated both Tinnie, his wife, and Dan Teague, the appellant, in places. The appellees' case depended primarily and most substantially upon the testimony of Tinnie Brown, the former Tinnie Teague, which consisted of, in our judgment, her incredible denial that she knew Mr. Carr, that she had ever seen Mr. Carr, and that she had ever been to his office until this occasion on April 5, 1941. Her statement in this regard is contradicted by the documentary evidence in the record, and by the sworn testimony of Mr. Carr himself, whose high position in an important Government function must command respect. Her evidence further is characterized by unreasonableness in the explanation she gave of why she went to the office of Mr. Glass, an attorney, an officer of the court and member of the Attala County Bar. She says that she

went there with Dan in pursuance of his promise to have himself made some kind of a guardian over her and her property, but Mr. Glass contradicted this, and stated that their purpose was to do what they did, and that he read the deed to Tinnie and explained it to her, just as Mr. Carr said he did with reference to the assumption agreement. Tinnie said that nothing was ever read or explained to her, and she did not know she was signing a deed. She is also contradicted by the certificate of the notary public, an officer who was under oath and bond, with the duty to reflect only the truth in his certificate, and which, under the law, it is presumed he did.

Furthermore, after April 5, 1941, Dan began to clear up the place, to clean out the ditches, to repair and enlarge the improvements, and turn the barrenness of the farm to fertility and production, so that, according to the testimony, it enhanced in value from $700 or $800 in 1941 to between $1,500 and $2,000 at the time of the trial. Thereafter, he also paid all the taxes and all of the installments to the Federal Land Bank as they became due. Tinnie is bound to have realized, in our opinion, that all of this labor and expenditure of money was not made on this place by appellant from sheer love of her by her uncle-in-law, and that she was not defraying their cost, especially where she was paying Dan such small and insignificant sums at irregular intervals. Dan, between the date of the conveyance and the trial of this case, had moved from the Delta to a house on the farm, which was of itself sufficient to inform Tinnie that he was not acting for her, without any compensation, and even without sufficient amounts paid to him for any purpose.

The solicitors for both parties agree that the issue before the Court is one of fact, and in this they are right. We are reluctant to disturb the findings of fact by a chancellor. Langston et al. v. Farmer, 176 Miss. 820, 170 So. 233. However, there are exceptions to the rule. Among them is that it is our duty to reverse if such findings are in our judgment manifestly wrong and against the overwhelming weight of the evidence. Appellees cite Hays

v. Lyon, 192 Miss. 858, 7 So. (2d) 523, 526, in support of their position that we should not disturb the decree in this case because it is based on conflicting testimony, and the chancellor decided in their favor; but in that case, we said: "We are not able to say, however, that in that respect his finding was manifestly wrong, wherefore, upon that point, also, his conclusions must be accepted by us as correct." Appellees also cite the case of Conn v. Conn, 184 Miss. 863, 186 So. 646, but in that case also we said: "The finding of the chancellor on an issue of fact will not be disturbed unless against the overwhelming weight of the evidence." In Gerard v. Gill et al., 195 Miss. 726, 15 So. (2d) 478, 480, 916, occurs the following: "We now say that the finding of the chancellor is manifestly wrong and that the great weight of the evidence is to the effect that appellees did sign this deed, and we so hold." It is unquestionably the rule in Mississippi, established by numerous cases, that the findings of fact by a chancellor will not be disturbed unless manifestly wrong or against the overwhelming weight of the evidence. But see Gillis v. Smith, 114 Miss. 665, 75 So. 451; Tarver v. Lindsey, 161 Miss. 379, 137 So. 93, and others. The rule also is affirmatively announced that the decree of the chancellor must be reversed, if manifestly wrong or against the overwhelming weight of the evidence.

In the case at bar, the burden of proof was upon appellees, and, in our judgment, the circumstances in the record, and the reasonableness of the testimony of Dan Teague, its corroboration by Mr. Carr, Mr. Glass, and the certificate of acknowledgment by Mr. Carballo, materially challenged, as it was, only by the unreasonable testimony of appellee, Tinnie Brown, alone, except as to inconsequential details by some other witnesses, created a condition wherein Tinnie could not and did not meet this burden. On the contrary, appellees were overwhelmed by the evidence against them. The decree of the chancellor, furthermore, did not adjudge that Dan had defrauded Tinnie, and overreached her by misrepresentation, or deceived her, or that she had failed to sign these instru-

ments; but simply that on April 5, 1941, the minds of the parties had not met; and therefore cancelled the deed. The chancellor's decision, we are of the opinion, was manifestly wrong, and it was against the overwhelming weight of the testimony, and we hold that the minds of the parties did meet, and that there was no deceit, misrepresentation or fraud practiced by appellant upon appellees in the procurement of the deed. We are therefore constrained to reverse the case and render a decree here dismissing the original bill, which we think the chancellor should have done.

The decree of the chancery court is therefore reversed, and decree entered here for appellant dismissing the original bill.

Reversed and decree entered here for appellant dismissing the original bill.