455 So.2d 739 (1984)
Harvey A. GOLD
v.
Oscar P. LaBarre, et al.
No. 54207.
Supreme Court of Mississippi.
June 6, 1984.
Rehearing Denied July 25, 1984.
*740 L. Joe Lee, Lee & Grenfell, Michael R. Medley, Jackson, for appellant.
Landman Teller, Teller, Chaney & Rector, Wren C. Way, Way & Field, Vicksburg, for appellee.
Before PATTERSON, C.J., and HAWKINS and PRATHER, JJ.
PATTERSON, Chief Justice, for the Court:
On May 20, 1981, Harvey Gold brought suit against Huette Barber, Oscar LaBarre, Johnny Jabour, The American Bank of Vicksburg and its Trustee, Landman Teller, Jr., in the Chancery Court of Warren County. Complainant sought cancellation of a warranty deed from himself to Johnny Jabour, cancellation of a deed of trust from Jabour to Landman Teller, Jr., Trustee for the American Bank; or in the alternative, that the deed from Gold to Jabour be cancelled and that complainant be awarded a joint and several judgment of $80,000 against Barber, LaBarre and Jabour; or in the next alternative, that Gold be granted a joint and several judgment of $54,313.60 against Barber, LaBarre and Jabour plus costs.
Each of the defendants answered, and issue being joined, the cause was heard on its merits. At the conclusion of complainant's case in chief, the American Bank and its Trustee, Landman Teller, Jr., and Johnny Jabour were dismissed on their respective motions that the complainant had failed by his evidence to establish a case against them. The trial continued against Barber and LaBarre and at its conclusion the bill of complaint was dismissed as to these defendants.
Aggrieved, Gold appeals to this Court assigning as error:
1. That the learned chancellor below erred in dismissing Jabour and the American Bank upon the close of appellant's case in chief;
2. That in the event the conveyance to Jabour and deed of trust to the American Bank are valid, appellant is the holder of a first lien against the subject property;
3. That the court below erred in dismissing Jabour at the close of appellant's case in chief;
4. That the chancellor below erred in not returning a judgment against LaBarre, Barber and Jabour; and
5. That the finding of facts and conclusions of law by the chancellor below were against the overwhelming weight of the evidence.
The appellant did not pursue his appeal against Jabour and the American Bank of Vicksburg, or its trustee, and these appeals were dismissed by this Court on January 5, 1983. The remaining appellees are Oscar LaBarre and Huette Barber from whom the appellant seeks a money judgment for the conversion of his property, thereby abandoning his other assignments of error.
Although this appeal is now limited to damages against Barber and LaBarre for conversion, it also necessarily relates in some degree to the record title to a parcel of real estate in Warren County because the record title, not real ownership, was the security basis for the loan or loans placed *741 in issue. The factual circumstances are singular; all appear to be sub-rosa, and the posture of the case before us is unusual. For these reasons we set forth the circumstances in some detail.
At some point in time prior to February 14, 1980, Huette Barber became the alleged "real" owner of a tract of land on Tiffintown Road in Bovina in Warren County. Although there is no disagreement between the parties or their attorneys that the land "somehow" belonged to Barber, his name appears nowhere in the deraignment of title either as a grantee, devisee, donee, by inheritance or otherwise. Notwithstanding this absence of record title in Barber it does emerge from the record that Barber manipulated the record title through others to raise money for his used car business without incurring the suspicion of the lending institutions or the ire of judgment creditors.
The first transfer of the land concerning the present issues was from Norman and Joyce Fields to Henry Harrel on February 7, 1979. The record title was placed in Harrel's name so that he could obtain money from the First National Bank of Vicksburg for Barber by pledging the record title as security for the loan, Barber remaining the undisclosed real owner. Thereafter Barber arranged a meeting in Attorney LaBarre's office for February 15, 1980. Those attending were Oscar LaBarre, an attorney; Henry Harrel, the holder of the record title to the property; Barber, a used car dealer (the alleged "real" owner of the property but with several outstanding judgments against him); Alex Gold, now deceased, a certified public accountant (Barber was one of his clients); and Harvey Gold, the son of Alex Gold, an accountant who worked in the office with his father. We note that Harvey Gold testified several times he was not present at the meeting but ultimately stated that he might have been present but did not participate in the discussions. The other attendees testified that he was present.
According to LaBarre the meeting was called to accommodate Barber in his desire to pay the loan that Harrel had obtained for him from the First National Bank of Vicksburg and for which purpose Harrel held the record title. LaBarre was also requested by Barber to ascertain the exact amount of money he needed to retire the mortgage as well as additional loans from Harrel. In connection with these requests LaBarre was asked to prepare a warranty deed from Harrel to Harvey Gold.
On February 15, 1980, those mentioned met in LaBarre's office, where Harrel conveyed the record title to Harvey Gold. The ostensible consideration for the conveyance was paid from $46,000.00 in cash which either Barber or Alex Gold brought to the meeting but which was disbursed by LaBarre and Barber. The source of the money is critical to the issues involved and is in sharp dispute since Harvey Gold contends it came from a loan he had negotiated with John Bell at his father's request. He testified that Bell did not want to loan the money to his father because the elder Gold was in ill health and for this reason the loan was made to him and that he signed the note to Bell on February 14, 1980. (Appendix 1.) Barber testified the money came to him directly from Bell. His testimony follows:
Q. From whom did you get the money?
A. John Bell.
Q. How much money did you get?
A. $46,000.
Q. Did you borrow it from him?
A. No.
Q. Why did he give it to you?
A. Because he had paid some people to burn my house.
MR. LEE:
I am going to object to that, your Honor.
MR. WAY:
Q. I don't want you to talk about any investigation, I mean I am talking about, did you borrow the money from him?
A. No.
Q. He paid you the money?

*742 A. He paid me to fix my house
Q. They have objected to your telling why, so just leave it right there, O.K.? Don't say anything else about it. O.K. $46,000 he paid you and do you want to tell the Court why he paid it to you?
A. Yeah, he paid it to me
Q. I just want to know if you want to tell the Court why he paid it? Not why he did; do you want to tell the Court?
A. It don't make me no difference.
Q. O.K. then. So you got $46,000?
A. Yeah.
In either event LaBarre prepared a receipt which was given to Harvey Gold at the time of the conveyance. It follows:

The receipt corroborates the testimony of Gold if it is not a sham to deceive prospective lendors of future loans. It portrays the quality of the testimony with which we are presently concerned. LaBarre explained,
A. I acknowledged receipt to Harvey Gold at Mr. Barber's request. This was at a meeting that was held the 15th day of February, 1980, which Mr. Harvey Gold, Mr. Alex Gold, Mr. Huette Barber, and Mr. Henry Harrel were all present in my office. The idea was in hopes that Mr. Barber would be able to obtain some additional funds to put in a stock of cars. Mr. Gold was to make an application for a loan. The loan was to be made in the name of Harvey Gold and thus the receipt was given at Mr. Barber's instance and request, by me to the Gold's that day.
Q. Then you are telling us you never actually received the cash money from Harvey Gold or his father, Mr. Alex Gold?
A. Absolutely not, sir.
Q. Do you know where the money came from?
A. It came from Mr. Barber's coat and pockets.
Q. Do you know where he obtained the money?
A. No, sir, I do not.
Q. What was the purpose of keeping the title to the property away from Mr. Huette Barber?
A. Mr. Barber had a number of judgments against him at the time and his credit rating was not available to make a loan himself, and he was trying to get a loan to get his used car business going back with a good deal of cars. In other words, for additional cars to sell.
LaBarre was positive that he did not represent Harvey Gold as an attorney and *743 neither did he know the source of the cash brought to his office by Barber, his client. He does concede, however, that on the occasion he gave Gold a certificate of title over his signature, in addition to the receipt mentioned. (Appendix 2.) The certificate of title has some significance in addition to its role of camouflaging the "real title," as there appears in it statements which seem to qualify LaBarre's oral testimony that he did not represent Gold. The statements,
As further outlined this date, I will at the proper time make application for title insurance for you or your assignee at no additional cost to you and the only items that you will pay are the title premiums, etc.
As further stated this opinion does not cover the second parcel as was shown in the deed to you as there are several objections to it.
Thank you for the opportunity to be of service.
The words "at no additional cost" and "thank you for the opportunity to be of service" seem to strengthen Gold's contention that he relied upon Attorney LaBarre to protect his interest in a later transaction involving a conveyance of the same real property because he had drawn the legal instruments and participated in disbursing the money involving Harvey Gold in the first transaction. We think this because the same attorney drew the first deed conveying the property to Gold, issued a receipt for the consideration and prepared a certificate authenticating title to be vested in Gold.
In later questions concerning the $46,000.00 LaBarre qualified his former testimony that he did not know its source, stating:
Q. At that time did you have any knowledge as to where the money he paid you that day was received from?
A. Only what Mr. Barber told me in their presence, which he said he got it from John Bell. John had paid him some money that he owed him.
Gold testified that John Bell came to his father's office on the day before the meeting with cash in excess of $35,000.00 which was counted by Bell and his father. After Bell had departed, Barber arrived and then left with his father to deliver the money to LaBarre in his office. From the record it undoubtedly appears that the money used to extinguish the lien of the First National Bank of Vicksburg and the indebtedness due Harrel was also the consideration for the conveyance from Harrel to Gold and that it came from John Bell either as a loan to Gold or as a direct payment to Barber.
Bell's version was that Alex Gold approached him to obtain money so that he could help a friend who was about to lose his house. He stated,
Q. You may proceed, Mr. Bell.
O.K. I loaned Mr. Gold the money so he could buy a house. He was going to get a house because somebody was supposed to be taking a house away from a friend of his, and he wanted the money to pay it off and fix it up and sell it.
Q. Who was the friend of his, do you know?
A. Huette Barber.
The money was delivered by him to Harvey Gold and his father. He explained,
Q. Have you later been informed by your attorneys or anyone else that Mr. Harvey Gold took title to real estate owned by Mr. Henry Harrel?
A. Yes, sir, I got a copy of it. I requested that when I loaned him the money. I got a copy of it where it's in Harvey's name.
Q. All right, sir. Was there a verbal understanding between yourself and Mr. Harvey Gold as to what he would do with the money you loaned him and what he was to receive was there any understanding?
A. Yes, sir.
Q. And what was that?
A. I would loan him the money; they would fix the house up, and when they sold it I would get my money back. That is exactly what the understanding was. When they sold the house I would get my money.

*744 Q. Why didn't you loan the money to Mr. Huette Barber?
A. Why did I?
Q. Why didn't you?
A. Because Huette won't pay nobody.
There is testimony that Bell was to receive in addition to the interest in the note the sum of $7,500.00 when the property was sold.
We return to Harvey Gold's testimony. It discloses that he did not actively participate in the above negotiations, but acted in accord with his father's instructions for which he was to receive, and did receive, $500.00 for the use of his name as the record title holder and perhaps for signing the note to Bell. All of the foregoing however, according to Gold, was with the understanding he would be paid the amount of the note when the property was sold so that he could repay Bell.
Unfortunately Alex Gold, the father, died before the case was tried and, of course, since the events leading up to the first meeting and its transaction were verbal, his testimony is unavailable and this obfuscation is compounded because Gold took no measures to protect himself but simply complied with his father's request. Other testimony indicates he did so to aid his father who was to receive $7500.00 from the sale of the house after renovation and sale.
The aftermath of the first meeting was that Alex Gold was unable to negotiate a SBA loan for Barber or to sell the house despite efforts to do so for a number of months. He then approached Johnny Jabour, a real estate broker with years of experience in the Vicksburg and Warren County area, for aid in moving the property. Initially Jabour did not want to get involved because the property had been offered for sale without success for more than 10 months, but he later changed his mind. He acquired the property under the following circumstances,
Q. Did you take steps to go ahead and buy this property?
A. I took steps to buy this property.
Q. What did you do in regard to those steps?
A. I went to the  at least I requested through Mr. Barber, who was telling me that he would get some money out of this deal, that if he got me two appraisals on the house, it would take that first to get a loan. He had one appraisal that he brought to my office, and then we found out that we had to have two, and he had those appraisals made and he paid for them, because I told him I wouldn't get involved with it, the appraisal part. There were two appraisals made; I went to the Bank, to Mr. James Cole at the Bank is the party I went to, and I told him I wanted to borrow $80,000 to purchase this house and that here were the two appraisals on the house.
Q. Were you familiar with what the $80,000 would be used for? Do you know?
A. Yes, I do. At least some light has come into the Court that I didn't know, but I can quote to you what was told to me and it was also told to me by Huette Barber, that he owed roughly $54,000  Fifty some-odd-plus is what he told me, he didn't say the exact amount, and it was another amount stated that his mother had made him a loan for an additional amount over that, that he was trying to pay back, and that the rest of the money would go to him.
Q. All right, sir. To whom was the $54,000 to be paid?
A. To Harvey Gold.
Q. You knew that?
A. Yes, sir, I did.
For his services in obtaining the loan Jabour was to receive $10,000 when the loan was closed as well as a six percent commission if the property brought more than $80,000.00 but with the understanding that if any funds remained after the sale, they would go to Barber. There was an additional agreement between Jabour and Barber which permitted Barber to live in the house pending its sale by paying the interest on the loan, the taxes and insurance on the property.
*745 Jabour was successful in obtaining a loan commitment of $80,000 from the American Bank in Vicksburg. Thereafter Harvey Gold was requested by either Barber or LaBarre to come to the attorney's office. In compliance he did so and on April 7, 1981, conveyed his interest to Johnny Jabour by a warranty deed prepared for his signature by LaBarre and which was left with the attorney for delivery. Jabour notified both Bell and Harvey Gold that the loan on the property would be closed at 3:00 o'clock p.m. on April 7, 1981, in The American Bank.
Despite the notice neither Bell nor Gold appeared and the loan was closed in The American Bank with James Cole, its President; Huette Barber; Johnny Jabour; and Oscar LaBarre present. Jabour thereupon transferred the title he had received from Harvey Gold to the bank for its trustee, Landman Teller, Jr., and the bank issued its check for $80,000.00 payable to Oscar LaBarre, Attorney; and Johnny Jabour. Although no longer an issue it should be noted there is testimony the bank officer was aware of the true situation, but since they were dismissed no testimony was offered by the bank concerning its standing as an innocent purchaser without notice.
While in the foyer of the bank immediately after the loan was closed Jabour told LaBarre that he needed to ascertain the sum due Harvey Gold and called him for that purpose. The line was busy so he then called John Bell because Jabour knew that he had loaned the money to Gold. When Bell responded Jabour asked him to hold and handed the phone to Attorney LaBarre, so he would be advised of the amount. Jabour stated that LaBarre noted the sum by writing it down following which he (Jabour) suggested they go to LaBarre's office to complete the transaction. He was next asked if he took any steps to secure payment to Harvey Gold and responded:
A. I asked Mr. LaBarre after we got off the telephone that we go back to his office to make the checks out to everyone, including myself. He stepped outside with Mr. Huette Barber, outside the front door, which I wasn't but about three or four feet from, and when he came back he said, "Huette's got so many judgments against him, he wants it to be done in cash."
Q. Did you take issue with that?
A. Well, he was the closing attorney, and God, I've known Oscar all of my life, and he's always done everything, you know, right to my knowledge, as far as my dealings with him, and every other attorney I've ever dealt with, so he said that is what he was going to have to do, and so he went to the window, asked me to sign the check, and he went to the window and they gave him $80,000, and I can't recall if it was in two bags or one bank bag, but he gave me $10,000, and he said that either I or we were going down to my office to pay off the rest of the stuff and I am going to take it by Harvey Gold's office within about 30 minutes.
Q. Now, Mr. LaBarre told you he was going to take the money by Harvey Gold's office in thirty minutes?
A. That's right.
LaBarre testified he prepared the warranty deed from Gold to Jabour, examined the title and certificate for The American Bank but that the bank prepared the deed of trust. He acknowledged his presence when the loan was closed and that he talked with Bell concerning the amount and Bell told him that Barber owed him $54,313.60. He stated the check was cashed because both Bell and Barber wanted cash and that when the money was received Jabour took $10,000, which Barber had promised him for securing the loan, and departed. LaBarre explained the remainder of the transaction as follows:
Q. Now, what else was said or done? What happened to the rest of the money?
A. I handed it to  the fact of the business is, my office is about two and a half blocks away from The American Bank, so we took it up, well, I handed the sack to Huette and we took it up to my office and he counted out my money and the tax money, and the fact of the business *746 is, I understood him to say that they were going to meet  John Bell, Alex Gold, were going to meet at Alex Gold's office because Alex Gold was both of 'ems accountant, and that was where the money was going to be transferred. Huette left my office on the way to go down to pay John Bell whatever he owed him.
Q. Now, what about when you were at the Bank and giving the money to Mr. Barber? Was Mr. Jabour there?
A. He was leaving right at that time, yes, sir.
Q. What, if anything, did he say or what, if anything, did you say to cause him to believe that you were going down to Gold's office?
A. I didn't say anything. I said, "We're going up to my office to take my fee and the taxes, and then Huette's going down to pay Mr. John Bell." That was my understanding as to what was happening.
Later in his office LaBarre deducted the sum due for taxes and his attorneys fee and Barber left with the remainder of the cash, it being LaBarre's understanding that he was going to meet John Bell and Alex Gold in Gold's office where Bell was to be paid. The record is all too clear that neither Barber nor the money ever appeared in either Gold's or Bell's offices. LaBarre stated he knew nothing of Barber's failure to reach his destination until called by Gold the next morning.
He explained, however, that he was unaware that Gold had any interest in the money and that Cole, the President of the American Bank, knew all about Barber's interest in the property because the two appraisals submitted to the bank by Jabour listed Barber as being in possession of the house. He also stated he prepared a certificate of title for Gold and the bank reflecting record title in Jabour through Gold's warranty deed. He maintained that he did not represent Harvey Gold and what legal work he performed in preparing the instruments was at the request of Barber, his client. When asked if such was proper or improper he responded, "Mr. Lee, I prepared them at the request of my client. I feel that they were proper under the circumstances that were involved." He acknowledged the telephone conversation with Bell from the bank but insisted that he, not Jabour, initiated the call and that Bell advised him Barber owed him $54,313.60. Moreover he was unaware of the note from Gold to Bell until this court proceeding.
Barber testified that he received $68,300 out of the transaction after Jabour deducted his $10,000.00 and LaBarre received his attorneys fee and a sum for taxes. He stated the money belonged to him because he was the real owner of the land sold to Jabour since there were no outstanding loans or materialmens liens against it. He conceded he owed John Bell $3,860.00 at the time but maintained that indebtedness arose from another transaction. The money was not taken to Bell by him because LaBarre had told him the indebtedness was $54,313.60 (the sum noted by LaBarre from the telephone conversation). When this amount was mentioned as an indebtedness by his attorney he (Barber) ended the conversation by responding, "He's crazy." However he left LaBarre with the impression that he was going to pay John Bell. Whether this was a reference to the lesser indebtedness arising from another transaction or the larger sum presently in issue, we are unable to determine from the record.
Disturbed by this turn of events Harvey Gold brought this suit against the The American Bank; Landman Teller, Jr., the bank's trustee; Attorney Oscar LaBarre; Johnny Jabour; and Huette Barber. As mentioned, the bank, its trustee and Jabour were dismissed both as to monetary judgment against them and any claim affecting their title. The suit has therefore reduced itself to the issue of the conversion of Gold's money by LaBarre and Barber since the propriety of dismissing the other defendants was not pursued on appeal.
Central to the issue of conversion is, obviously, the legal entitlement of the complainant to the property alleged to have *747 been wrongfully converted. Absent evidence of ownership the complainant's suit must necessarily fail, but if ownership be established in the complainant, additional evidence is required to substantiate the allegations that the defendants wrongfully converted the property to their own use.
Undoubtedly, the trial court had before it a difficult case to decide, there being several parties, testimony that conflicted at every turn, and sub-rosa transactions involving the professional integrity of an attorney of many years practice. This gave rise to several issues for decision, but unfortunately some of them were not decided and others were erroneously decided. This Court's task is no less difficult because we are confronted with the same facts in addition to our reluctance to reverse a chancellor on the facts unless it appear that he is manifestly in error. However, we need note that it becomes our duty to do so when it is apparent to this Court that such error exists. Lampley v. Pertuit, 199 So.2d 452 (Miss. 1967); Smith v. Cook, 213 Miss. 876, 58 So.2d 27 (1952); Teague v. Brown, 199 Miss. 262, 24 So.2d 726 (1946); and Gerard v. Gill, 195 Miss. 726, 15 So.2d 478 (1943). These rules are mandated so that justice might be done in accord with the evidence in all cases. Moreover, we are authorized to reverse and remand for a new trial when dispositive issues remain undecided by the trial court. See Oliver Finnie Grocery Co., et al v. Bodenheimer, et al, 77 Miss. 415, 27 So. 613 (1900).
Our present concern is that some of the trial court's findings are manifestly erroneous and other critical issues were not decided. There was no finding, indeed no mention in the trial court's opinion, of the receipt for $37,966.53 which Gold received from LaBarre at the conclusion of the first transaction. This was the meeting in LaBarre's office which resulted in the retirement of the indebtedness to the First National Bank of Vicksburg as well as indebtednesses of Barber to Harrel. The genuineness of this receipt is inexorably linked to the source of the $46,000.00 thought necessary to retire the loans mentioned and to renovate the house so it could be sold. We think it obvious that if the funds came from Gold by way of a loan from Bell, great support would be lent to the authenticity of the receipt and Gold's contentions of his initial interest in the land and the subsequent transaction related to it would be enhanced. A contrary finding by the trial court, that the funds came directly from Bell to Barber and were used to retire the loans, would decimate Gold's claim for conversion. Inescapably, however, such finding would also have the effect of branding each of the participants, except the bank and its trustee, but including Gold and Attorney LaBarre, as co-conspirators in a scheme to deceive prospective lendors and avoid judgment creditors by flying the flag of record title while simultaneously concealing the real ownership. We are of the opinion this necessitates a reversal.
In disposing of these issues and leaving them undecided, the trial court found that neither Barber nor anyone else authorized or requested Harvey Gold to execute a note for $48,760.00 to John Bell, and neither did Barber agree in any way to the terms of the note and this was not satisfactorily explained to the court. The court concluded, "There are a lot of money hungry parties involved, all those open hands for $7500.00 or $10,000 or better, wanting a slice of the pie in this case." These comments while perhaps proper did not reach the dispositive issue because Gold did not need authority from Barber to negotiate a loan from Bell. The question was and is, did Gold's funds retire the indebtedness that existed on the property on February 15, 1980. The court further found that Gold gave no accounting or any statement to LaBarre when he went by the attorney's office to sign the deed to Jabour. From this the court determined that Gold was not really claiming any money. Again, we think it apparent that if the receipt issued to Gold be not a deceit that LaBarre was at least aware of the sum mentioned in it because it was written in longhand over the attorney's signature.
*748 The court found from the believable evidence that LaBarre was representing only Barber and that after the loan was closed, the telephone communication from Jabour to Bell caused both Bell and Gold to "become excited about getting some of the money, including the $7500.00 each, testified to by Bell, and as they stirred around they employed an attorney and sued every party who had anything to do with any of these transactions, ..." However, there is simply no evidence to support this finding. After concluding that the defendants were not liable to the complainant the court substantiated its findings by the following,
The evidence does not substantiate it and if it did, the Court is of the opinion the statute of fraud would prevail, that usury is involved, and Mr. Harvey Gold has come into this Court asking this Court to do something that he failed or neglected to do to protect himself. He is an Accountant. He knows that he was in a position of trust holding this property for the benefit of Mr. Barber. He signed the deed at Mr. Barber's request but he concealed from him and Mr. LaBarre the signing of a note which he now wants to transfer to the defendants in this case. Mr. Gold had the title to the property so if he had wanted to give a Deed of Trust on it to secure that indebtedness, he should have done so prior to signing the deed to close that loan. He was certainly negligent in failing to bringing any statement of any claim or to be present at the loan closing, if he did have a claim at that time, which Court seriously doubts.
It seems to us that if Gold were the trustee for Barber then surely he could not execute a deed of trust in violation of the trust to protect himself. But if the court's reference is to the execution of a deed of trust commensurate with an interest in the land equal to the sum in the receipt, then if that be the correct interpretation of the court's finding, it was also erroneous because no relief was granted Gold. We therefore are of the opinion the trial court manifestly erred in these findings.
The testimony is overwhelming that Gold did not pay LaBarre an attorneys' fee, but we do not think payment is the sole criteria to be considered in determining whether an attorney-client relationship existed. To base the relationship on the narrow basis of payment does not address the attorneys' responsibility in a multi-person transaction fraught with the probability of conflicting interests to disclose that he represents only one of the participants, thereby notifying the others of the true situation so they might take reasonable steps to protect themselves.
There is much evidence, in our opinion, which would have led Gold to believe, not unreasonably, that LaBarre would protect his interests. We think this because LaBarre drew the first conveyance from Harrel to Gold, drew the receipt for $37,966.53 and handed it to Gold, prepared Gold a certificate of title and participated in the distribution of the funds at the February 15, 1980 meeting. Preceding the April 7, 1981 meeting at the American Bank, LaBarre drew the deed conveying Gold's interest in the property to Jabour and prepared a certificate of title for the American Bank and Gold. In addition LaBarre assisted in the attempt of Barber to obtain an SBA loan, which according to the testimony, the complainant's father, Alex Gold, had also undertaken.
We do not mean by the above remarks to indicate the lack of disclosure imposes liability on LaBarre for the conversion. We mention it because it has the potential of liability and will probably be an issue if it is first determined on retrial that Gold was the source of the funds removing the indebtedness from the land in the first instance. Of interest see In re Boivin, 271 Or. 419, 533 P.2d 171 (1975); In the Matter of Edward J. Dolan, 76 N.J. 1, 384 A.2d 1076 (1978); and the Code of Professional Responsibility of the Mississippi State Bar, approved March 15, 1971, by the Supreme Court of Mississippi, amended March 16, 1983, Interests of Multiple Clients, EC5-14, et seq.
REVERSED AND REMANDED.
*749 WALKER and ROY NOBLE LEE, P.JJ. and HAWKINS, DAN M. LEE, PRATHER and SULLIVAN, JJ., concur. BOWLING and ROBERTSON, JJ., not participating.

APPENDIX "1"
$ ____ VICKSBURG, MISS. ____ 19__
_____________________________________ after date the undersigned
promises to PAY TO ___________________________________ or order,
_________________________________________________________ DOLLARS
in lawful money of the United States for value received, together
with interest at the rate of ____ per cent ( ) per annum from
____ until paid, the interest payable ________________; and a
reasonable attorney's fee if this note be placed in the hands of
an attorney for collection, and all costs of Court and other
costs and charges properly incurred.
The drawers and endorsers severally waive presentment for
payment, protest and notice of protest and non-payment of this
note.
Negotiable and payable at _______________________________________
 ________________________________
 ________________________________
 ________________________________

APPENDIX "2"
 15 February 1980
Mr. Harvey A. Gold
Alex Gold & Associates
P.O. box 1084
Vicksburg, Mississippi 39180
 Re: Pt. Section 9, T 16, R5R
 First parcel in deed from
 Henry Harrel to you, and same
 as in fields deed in Book 603,
 page 326
Dear Harvey:
Pursuant to your request the undersigned has this date brought up to date a title opinion and insurance policy that was finished in February of 1980 regarding the above described property, and I find from said examination that there are no intervening liens or encumbrances since the recording of a deed of trust from Henry W. Harrel to John C. Wheeless, Jr. as Trustee from the First National Bank of Vicksburg as Beneficiary securing a loan of $25,000.00 at 10% interest. Said deed trust is recorded in Book 613 and at page 111. I have this date cancelled the deed of trust by making payment to the First National Bank and Mr. Walter Jones has signed the cancellation, which is this date recorded.
*750 I did check the land records, the lis pendens docket, the liens of construction; the judgment roll and other records in the office of the Chancery Clerk and Circuit Clerk that affect title to the property, and find no other liens or encumbrances other than the minerals as mentioned in the deed and the covenants as outlined therein. The opinion is based on the records and no other certification is given. I did not check the taxes as stated to you in conversation this date, but since you have knowledge of this situation I feel that you have knowledge.
As further outlined this date, I will at the proper time make application for title insurance for you or your assignee at no additional cost to you and the only items that you will pay are the title premiums, etc.
As further stated this opinion does not cover the second parcel as was shown in the deed to you as there are several objections to it.
Thank you for the opportunity to be of service.