415 So.2d 1029 (1982)
ROSS CATTLE COMPANY
v.
Bryant LEWIS, Cow Palace, Inc., Charles DeLony and Jim Reeves.
No. 53094.
Supreme Court of Mississippi.
May 19, 1982.
*1030 Powell & Thrash, Roy D. Powell, Jackson, Reeves & Reeves, Robert S. Reeves, McComb, for appellant.
Mounger, Mounger & Mord, Tylertown, Roach, McMillan, Welch & Ott, T. Patrick Welch, McComb, Keith Starrett, Magnolia, for appellees.
Before SUGG, BROOM and BOWLING, JJ.
BROOM, Justice, for the Court.
Obligations pursuant to the special property interest provision of our Uniform Commercial Code as applied to a written contract whereby defendant/appellee Bryant Lewis was to sell to plaintiff/appellant Ross Cattle Company (Ross herein) four hundred animals (cattle) at $47.50 per hundred weight form the background of this suit appealed from the Circuit Court of Pike County, Mississippi, Judge Joe Pigott, presiding. *1031 Another defendant/appellee is Cow Palace, Inc., an auction sales corporation through which Lewis sold the animals under contract. Individual defendant/appellees are Charles Delony, Cow Palace's president, and its vice president, Jim Reeves. After Lewis sold some of the animals through Cow Palace's auction business for sums in excess of that provided in his contract with Ross, Ross sued for the difference between the contract price and the sum which the animals brought at the sale, plus the average weight of 113 animals unaccounted for under the contract, and $8,000 which Ross paid Lewis when the contract was executed. Directed verdicts were entered by the court exonerating Cow Palace, Delony and Reeves, and the jury found for defendant Lewis. Ross moved for a judgment notwithstanding the jury verdict or in the alternative, an additur, which the court sustained to the extent of $8,000 in which sum the court entered judgment for Ross. On its appeal, Ross argues that: it should have been granted a peremptory instruction below; the jury verdict is not supported by the evidence; and under Mississippi Code Annotated § 75-2-501 (1972), it had a special property interest in the cattle. We reverse.
Date of the contract between defendant Lewis and plaintiff/appellant Ross was February 10, 1978. It provided for delivery of the animals at the sale barn in Brookhaven between May 15 and May 30, 1978. According to the contract (a copy is attached as Appendix "A"), the animals were to be weighed and sorted at the sale barn, giving Ross the option of rejecting up to 5% for crippled, deformed, etc. Subsequent to the contract's execution, point of delivery was changed from Brookhaven to Tylertown. When the contract was signed, Ross paid Lewis $8,000 as a down payment leaving the balance payable upon delivery following weighing of the animals. On Sunday, May 20, 1978, delivery of the animals was discussed by Lewis and Ross's agent. As stated in Lewis's brief, he required payment "before the cattle were moved as he had been told by the agents of Ross Cattle Company that the cattle would be moved out of the State on out of State trucks."
According to Lewis, he had consulted his banker and attorney and they both insisted on payment before the animals were moved.
Appellee Lewis in his brief states that he "offered to take the cattle to the sale barn in Tylertown and have them weighed and wait two days for Ross Cattle Company to get the money together and at that time the cattle could be moved." He states that this quoted testimony is at page 27 in the abstract, but we find no such testimony there. We have taken it upon ourselves to sift through the actual record of Lewis's testimony to see if it shows that he offered to take the animals to the agreed place in Tylertown and hold them there two days in which time Ross could get up the money. The portion of his testimony most nearly matching that quoted above taken from his brief is the following:
Q. Did you ever tell Ross Cattle Company that you were canceling the contract?
A. You mean telling them straight out that I was canceling it?
Q. Yes?
A. Not if they offered to pay for the cattle, they could have got the cattle on Monday. I told them twice on Monday they could get the cattle.
Q. Did you tell them before that?
A. Yes, sir. On two occasions.
Q. When?
A. One time was on Sunday, the 20th of May, Van Tucker called my house and I told him he could get the cattle but they would have to pay for the cattle, and they would have to let them stay in the sale barn two days, and if they didn't want the cattle, and I didn't get the money, I'd carry the cattle back home. There was no confusion with the cattle. One thing, the bank demanded the money be paid for the cattle because they had a deed of trust on my cattle and on my property and I had a chance of losing everything I had if the cattle left without being paid for.
*1032 It is to be noted that the quoted testimony makes no mention of delivery at "Tylertown", which the contract (as modified) provided. Lewis's defense (that he offered delivery as required by the contract) was affirmative in nature requiring proof with clarity. The quoted passage does not state with clarity that Lewis offered to make delivery to Tylertown as required by the contract.[1] None of this testimony can be taken to constitute a refusal of Ross to perform according to the contract. If anything, both Mr. Lewis's and Mrs. Lewis's testimony shows that they were not in an attitude of delivering the animals where contracted (at Tylertown) until Ross tendered the money. This is not according to the contractual terms. On May 29, Lewis took some of the animals to the Cow Palace sales barn in Fernwood and placed them in line for sale. When Ross's employees learned that the animals were at the Cow Palace, telephone calls were made to Cow Palace's president, defendant Delony, advising Delony that Ross had the cattle under contract. As to whether Delony actually saw the contract that day, his testimony is uncertain. Ross then employed counsel who filed a replevin suit seeking to stop the sale and gain possession of the animals for Ross, resulting in service of process upon Lewis, at which time Reeves admittedly looked at the papers the lawyer brought and was told it was a contract. Nevertheless, the cattle were sold for an amount in excess of that provided in the contract except that 113 were not sold or ever accounted for. Other facts will be stated where appropriate in this opinion.
First argument made is that the verdict was against the overwhelming weight of the evidence. In addition to the facts stated above, other significant facts are the following: Tylertown Bank had a lien against the cattle in the amount of $10,000 and the existence of it was unknown to Ross. After signing the contract, Lewis heard "rumors" that Ross was not in good financial shape. Arthur Van Tucker, a buyer for Ross, according to Lewis's testimony, called him early in the year demanding delivery, but he refused because the contract stated the delivery date to be between May 15 and May 30. Tucker denied this, and further testified that he talked to Lewis twice, once when Lewis called him to change the delivery point and another time around May 14 to see when he could take delivery. Lewis testified that during the conversation Tucker said Ross could not pay for the cattle upon delivery and that they were taking the cattle out of state for resale. This was denied by Tucker who contends he didn't even know where the cows were going.
Around May 25, 1978, Reeves, Cow Palace's vice president, contacted Lewis about consigning his cattle to the Cow Palace for sale on the following Monday. With Lewis's agreement the cows were moved from his farm to the Fernwood auction with Cow Palace trucks without Ross being advised about movement of the cows or the plans of Lewis to sell them through the Cow Palace. The auction sale was on Monday, May 28. Cow Palace's representatives denied knowing anything about the contract between Lewis and Ross until they received a call from Ross's office manager the morning of the auction inquiring whether the animals were there and telling Cow Palace officials that the animals were under a contract with Ross. The phone call set in motion inquiries between Reeves of the Cow Palace and Lewis. Reeves said Lewis told him the contract was "no longer good" and had been broken. Delony called Ross back and told him the animals were at the auction. Delony agreed to delay sale of Lewis's animals until the issue was settled. During this time, Lewis said he talked to the bank's attorney, who told him to go ahead with the sale at the auction.
*1033 In the meantime, Ross's agent Herbert McMullan arrived at the Cow Palace around 1 p.m. to keep the animals from being sold. McMullan took Magnolia attorney Bob Reeves with him. A confrontation between all three parties took place in an office at the auction. Lewis and his wife, McMullan, attorney Reeves, and Delony were present.
McMullan testified that he told Lewis that Ross had the animals under contract and would like to receive them. He said Lewis told him he had been advised to go ahead and sell the animals. Further testimony of McMullan was that he didn't bring any cash with him to pay Lewis, but he said he offered to go back to Jackson and get a cashier's check to pay, which offer Lewis refused. McMullan further testified that he explained to Delony and Reeves that the animals were under contract to Ross and asked them not to sell them, but Delony told him he was in the auction business and was going to sell them. His version was that he talked to the bank's attorney by phone from the auction, and the attorney said he told McMullan that he would not allow Ross to load the animals and carry them to another sales point unless they were paid first. The bank's attorney's testimony was that McMullan told him they could not pay for the animals. Two hundred and forty-eight of the animals were sold that day and a check for $82,479 was issued to Lewis and to the bank's attorney as trustee for the bank. The Cow Palace was paid a $4,340 commission. Thirty-nine additional cows were sold through the auction on June 4, 1978 for $9,645. The Cow Palace received a $570 commission on this sale. As a result of selling the cows at the auction, Lewis received approximately $15 per hundred pounds more than he would have under the Ross contract ($47.50 per hundred per Ross contract versus $62.31 per hundred at the auction).
Throughout his testimony Lewis never denied that he didn't deliver the animals as required by the contract. According to him, he offered to deliver the animals if Ross would pay beforehand. Lewis said he thought the animals were going to be hauled out of state and he would never be paid. Also, he agreed that he never gave Ross written notice that he was cancelling the contract. Testimony of Cow Palace officials Reeves and Delony indicates in effect that they decided to go ahead and sell the animals after conferring with Lewis and the bank's attorney.
On the other hand, Ross denied that his company was in shaky financial condition, but he made no denial that he never tendered the remaining money on the contract to Lewis. Instead, he said he would have paid if the animals had been delivered as per the contract.
In granting a directed verdict in favor of defendants Cow Palace, Reeves and Delony, the trial judge stated the three defendants had been placed "in a position of being on the triple horns of a dilemma." The judge said that he could not see that the three had done anything other than what a reasonably prudent man should have done under the circumstances and he found that there was no contract between the three and Ross. Therefore, he ruled that no liability in contract or tort was established against the three by the evidence. Thus, the action as against the three was dismissed. The case went forward as to Lewis and the jury found for him. A judgment notwithstanding the verdict was granted by the trial judge in the amount of $8,000, that amount being for the partial payment Lewis had received under the contract.
Without doubt there was a contract between Lewis and Ross. In fact, Lewis concedes the point in his brief, and also concedes that he received $8,000 partial payment under the contract. Apparently Lewis defends his actions by arguing that Ross breached the contract first by not offering to pay prior to delivery and therefore he should be allowed to treat the contract as breached and not performed as required.
Inasmuch as the contract involved a proposed sale of goods (animals), various sections of the Mississippi Uniform Commercial Code are germane to the resolution of the issue before us. The obligation of the seller (Lewis) was to transfer and deliver; *1034 the obligation of the buyer (Ross) was to accept the goods (animals) and pay in accordance with the contract. Miss. Code Ann. § 75-2-301 (1972). Tender of delivery requires that the seller put and hold conforming goods at the buyer's disposition and give the buyer any notification reasonably necessary to enable him to take delivery. Miss. Code Ann. § 75-2-503(1) (1972). Tender of delivery must be made by the seller to activate the buyer's duty to accept and pay for the goods unless otherwise agreed. Tender on the part of the seller entitles him to then expect from the buyer acceptance of the goods and payment according to the contract. Miss. Code Ann. § 75-2-507(1) (1972). Where payment is due on delivery, the buyer's rights as against the seller to retain and dispose of the goods is conditioned upon the buyer making the payment due. Miss. Code Ann. § 75-2-507(2) (1972).
Thus, in accordance with these provisions the obligations of the parties became as follows: Lewis, the seller, was obligated to transfer and deliver the animals to buyer/Ross who was obligated to accept and pay for them according to the contract terms. Seller/Lewis was required to put and hold the animals at Ross's disposition and give Ross reasonable opportunity to take delivery. Ross's duty to accept and pay for the animals was conditioned upon Lewis's tender of delivery. Inasmuch as payment was due on delivery, Lewis was entitled to payment from Ross only when he (Lewis) tendered delivery of the animals as contracted. The written contract specifically called for the animals to be weighed upon delivery, and the total price computed (upon the per pound price) and paid. Also, the contract specifically stated that the balance of the price of the contract was due upon completion of the contract.
The record is clear that Lewis never tendered delivery of the animals to Ross at Tylertown as the contract required. In fact, prior to the expiration date of the contract, Lewis consigned the animals for sale to the Cow Palace without giving Ross a genuine opportunity to perform under the contract. Lewis repeatedly testified that he wanted his money before delivery because he had heard rumors that Ross was in poor financial shape and that Ross planned to move the animals out of the state; Lewis had lost money before when other animals (other transactions) were going to be moved out of state. According to Lewis, he had been instructed by the bank's attorney not to let the collateral be moved without receiving payment. The UCC of this state specifically addresses the procedures to be followed in such a situation. Mississippi Code Annotated § 75-2-609 (1972) provides:
(1) A contract for sale imposes an obligation on each party that the other's expectation of receiving due performance will not be impaired. When reasonable grounds for insecurity arise with respect to the performance of either party the other may in writing demand adequate assurance of due performance and until he receives such assurance may if commercially reasonable suspend any performance for which he has not already received the agreed return.
(2) Between merchants the reasonableness of ground for insecurity and the adequacy of any assurance offered shall be determined according to commercial standards.
(3) Acceptance of any improper delivery or payment does not prejudice the aggrieved party's right to demand adequate assurance of future performance.
(4) After receipt of a justified demand failure to provide within a reasonable time not exceeding thirty (30) days such assurance of due performance as is adequate under the circumstances of the particular case is a repudiation of the contract.
According to § 75-2-609(1), when either party has "reasonable grounds for insecurity" with respect to the other party's performance, the insecure party may demand in writing adequate assurances of the other party's performance and until he receives *1035 such assurance, he may suspend his own performance.[2]
Purpose of the demand for assurances of performance by the insecure party is to gain advance knowledge of a forthcoming breach so that he may take steps to lessen his injury, or mitigate damages. If no assurance is given upon demand, or if the assurance given is inadequate, then the aggrieved party can treat the contract as repudiated. 1 A. Squillante and J. Fonseca, The Law of Modern Commercial Practices § 3:77 (1980).
Our view is that § 75-2-609 provides the course of action Lewis should have pursued if he doubted that Ross would pay under the contract. He should have requested assurances of Ross's performance and while awaiting such he could have suspended his obligation of delivery. Instead, after Lewis felt insecure he elected to treat the contract as broken and sell the animals covered by the contract to a third party. Instead of following the course delineated by § 75-2-609, Lewis accepted advice from an attorney who represented the bank which had a lien on the cattle. Obviously the bank's interest did not precisely coincide with Ross's interest.
In order to logically find that Lewis's actions (sale to a third party) were other than a contractual breach, there would have to be a finding that Ross had first repudiated the contract. Mississippi Code Annotated § 75-2-610 (1972) provides that when either party repudiates the contract with respect to a performance not yet due so as to substantially impair the contract, the aggrieved party has several options available. Such party may cancel the contract and properly bring suit for damages, or may suspend his own performance and for a commercially reasonable time await performance by the repudiating party or he may resort to any of the remedies for breach in accordance with Mississippi Code Annotated § 75-2-703 (1972), that is, withhold delivery, resell the goods, or cancel the contract.[3]
Careful study of the record causes us to conclude that the verdict of the jury in favor of defendant Lewis is against the overwhelming weight of the evidence. Without any substantial dispute the evidence establishes that Lewis never tendered the animals as required by the statute, but instead he sold them to a third party. It cannot be fairly said that the evidence shows an anticipatory repudiation of the contract by Ross such as would have reasonably allowed Lewis to treat the contract as cancelled. In fact, the evidence establishes that Ross tried to keep the cattle under contract as evidenced by his sending a representative with an attorney to the auction to plead with Lewis not to sell the cattle.
Another argument of appellant Ross is that the lower court erred in granting for the defendant Lewis instructions numbered DL-8 and DL-17. Reversal will not be ordered on this argument pertaining to the instructions because the record does not show that Ross objected to the instructions at trial. Miss.Sup.Ct.Rules R. 42 (1976).
Next argument is that the lower court erred in dismissing the suit against Cow Palace, Delony and Reeves. As to these three defendants, the suit of Ross was *1036 based on Mississippi Code Annotated § 75-2-722 (1972), which states:
Where a third party so deals with goods which have been identified to a contract for sale as to cause actionable injury to a party to that contract
(a) a right of action against the third party is in either party to the contract for sale who has title to or a security interest or a special property or an insurable interest in the goods; and if the goods have been destroyed or converted a right of action is also in the party who either bore the risk of loss under the contract for sale or has since the injury assumed that risk as against the other;
(b) if at the time of the injury the party plaintiff did not bear the risk of loss as against the other party to the contract for sale and there is no arrangement between them for disposition of the recovery, his suit or settlement is, subject to his own interest, as a fiduciary for the other party to the contract;
(c) either party may with the consent of the other sue for the benefit of whom it may concern.
In substance, § 75-2-722, supra, provides for a cause of action against a third person who deals with goods that have been identified to a contract in such a way as to cause an actionable injury to a party to the contract. The right of action is given to either the seller or the buyer who has title to or a security interest in, or a special property or insurable interest in the goods. 67 Am.Jur.2d, Sales § 236 (1973). The effect of § 75-2-722 is that third parties will be liable for conversion, physical damage to goods, or interference with the buyer's rights in goods. Draper v. Minneapolis-Moline, Inc., 100 Ill. App.2d 324, 241 N.E.2d 342 (1968). Mississippi Code Annotated § 75-2-103 (1972) defines a buyer as a person who buys or contracts to buy the goods.
Upon the evidence we think Ross had a right of action under this section against Cow Palace, Delony, and Jim Reeves. There can be no doubt that Ross had a special property interest in the animals because the company had contracted to buy them and the animals had been identified to the contract.[4]
In their brief, appellees Cow Palace, Delony and Jim Reeves concede, arguendo, that Ross had a special property interest and an insurable interest in the animals pursuant to Mississippi Code Annotated § 75-2-501(1) (1972). These appellees take the position that inasmuch as actual title remained in the seller (Lewis), the buyer (Ross) can sue only for breach of contract "and not for conversion." Further, the position of appellees Cow Palace, Delony, and Jim Reeves seems to be that, since Ross did not have legal title to the animals or the right to the immediate possession of them, and because the cattle were bound by Tylertown Bank's existing perfected security agreement, no action for conversion lies against Cow Palace, Delony, and Jim Reeves. We think that if the law in this jurisdiction has ever been as stated by these appellees, the law changed with the enactment of § 75-2-722, supra. The uncontradicted proof is that when Lewis contracted for the sale of the cattle to Ross and identified them, Ross became vested with a special property interest. Miss. Code Ann. § 75-2-501. From that time on, Lewis was bound to deal with the animals without impairing or defeating the rights of Ross.
No case is cited in the briefs before us, and we have found none, interpreting § 75-2-722 upon facts like those established in the record. The plain black letter language of § 75-2-722 means that Ross having a "special property" interest in the animals has a right of action against the third parties (Cow Palace, Delony, and Jim Reeves) because they were "converting" the *1037 animals after they were shown or given knowledge of Ross's contract vesting in Ross the special property interest in the animals. These three defendants/appellees, with full knowledge of Ross's claim against the animals, actively and knowingly aided and abetted Lewis in disposing of the animals contrary to his contract with Ross. Their argument that Delony delayed the sale for a time to give Ross and Lewis an opportunity to work things out does not in reality support their claim of no wrongdoing, but instead shows that they recognized Ross's claim and then sold the animals in spite of Ross's claim against them. It follows that the argument of Delony and Reeves that they made a decision to proceed with the auction sale of the animals as any reasonable business man would have done cannot be accepted and is without merit upon this record.
These appellees make the argument that the auctioneer is not liable for conversion in selling property for one who either had no title to the property or had no authorization to sell "where it is proved that the auctioneer was innocent of any intentional wrongdoing, having no knowledge, actual or constructive, of anything that would cause him to question the right of one presenting the property for sale to contract for its sale." Annot., 96 ALR 2d 208 (1964). The cited authority refers to Dixie Stock Yard, Inc. v. Ferguson, 192 Miss. 166, 4 So.2d 724 (1941). Language, appropriate here, excerpted from Dixie Stock Yard, is:
If the proof sufficiently establishes that the appellant participated in the conversion of the cattle and in defeating the purchase-money lien thereon, with notice thereof, then such proof should be sufficient to sustain a verdict rendered on a count of the declaration charging that the appellant itself received and converted the same to its own use with notice of the lien.
* * * * * *
And, as heretofore stated, we are of the opinion that proof of participation in a conversion, with notice of an existing lien on the property converted, is sufficient to establish liability under a count of the declaration charging the defendant itself with the conversion thereof.

Id. at 179, 4 So.2d at 728.
Here Ross's special property interest is comparable to the existing lien in Dixie Stock Yard. There can be no doubt that Ross had a special property interest in the animals and that auctioneers Cow Palace and its officers Delony and Jim Reeves, having full knowledge of Ross's interest, sold the animals.
They make the further argument that for Ross to maintain his action for conversion against them he had the burden of proof to show he had "title or ownership in the property involved." The explicit language of § 75-2-722, supra, does not require that one bringing an action such as that asserted here by Ross must have legal title to or the right to possession of the property, because the statute allows such an action to be based upon a "special property or an insurable interest" which admittedly Ross had in the present case. Cases relied upon by these appellees in their brief predate the enactment into law of § 75-2-722, and thus would not be controlling should it be conceded that they might have supported the argument prior to enactment of our Uniform Commercial Code.
The amended declaration of Ross alleged that he had a "special property interest" in the animals, and that a copy of the contract creating the special property interest was shown to Delony and Jim Reeves. Further the declaration charged that Cow Palace, Delony, and Jim Reeves disregarded "this notice ... of special property interest" and sold the animals at auction thereby converting them and damaging Ross. The charges were adequately supported by evidence, and barely contradicted, if at all, as to the crucial issues.
Petitioners Cow Palace, Delony and Reeves argue in their petition for rehearing *1038 that this Court was in error in holding that Ross was entitled to a peremptory instruction against them. Petitioners correctly point out that Ross did not make a motion for a directed verdict against them; nor did he ask for a peremptory instruction at the conclusion of all the evidence because at that juncture these three petitioners had been let out by the directed verdict when Ross rested its case in chief.[5] As to defendant Lewis, Ross properly requested and was entitled to, and was erroneously denied, a peremptory instruction. Petitioners Cow Palace, Delony and Reeves argue that under such circumstances our prior decision holding that Ross was entitled to a peremptory instruction against them should be withdrawn and that they should be allowed to fully defend the lawsuit in the lower court. With this argument we agree.
It is true that as to Cow Palace, Delony and Reeves (who were let out by directed verdict) Ross asked for neither a directed verdict nor a peremptory instruction and did not mention the granting of the directed verdict in his motion for a new trial. However, we are not precluded from reviewing the actions of the trial court in granting the directed verdict in favor of the three defendants. In Hayes v. Slidell Liquor Co., 99 Miss. 583, 55 So. 356 (1911) we held that error in directing a verdict is reviewable on appeal even though such error was not assigned as a ground in a motion for a new trial. (For an excellent explanation of what is required to be set out in a motion for a new trial in order to take advantage of the error on appeal see Colson v. Sims, 220 So.2d 345 (Miss. 1969) at footnote (1) on page 346.)
Therefore as to defendants Cow Palace, Delony and Reeves we hold that Ross made out a case against them sufficient to go to the jury. Thus in accordance with the applicable Uniform Commercial Code statutes, supra, which unfortunately are not yet well known in Mississippi, the case must be reversed and judgment and liability rendered as to only the defendant Lewis, and remanded for retrial against him on the issue of damages only. See Mississippi Code Annotated § 75-2-711 (1972), pertaining to "Buyer's remedies." As to defendants Cow Palace, Delony and Reeves, the case must be reversed for a jury trial on all issues raised against them as to those animals under the contract sold at Cow Palace's auction.
REVERSED AND REMANDED FOR ASSESSING DAMAGES AS AGAINST BRYANT LEWIS; REVERSED AND REMANDED FOR RETRIAL OF ALL ISSUES AS TO DEFENDANTS COW PALACE, DELONY AND REEVES.
PATTERSON, C.J., SMITH and SUGG, P. JJ., WALKER, ROY NOBLE LEE, BOWLING and HAWKINS, JJ., concur.
DAN M. LEE, J., takes no part.

*1039 APPENDIX A

NOTES
[1] At oral argument, Lewis's counsel was asked by the Court to refer the Court to testimony in the record supporting the assertion that Lewis tendered or offered to tender the animals to Ross at the Tylertown sale barn. Counsel then referred the Court to pages 361-364 of the record. Those pages contain testimony of what Mrs. Lewis heard her husband state to another person (Tucker) on the telephone. She did not testify that Mr. Lewis tendered or offered to tender the animals at Tylertown.
[2] Comment 1 to the "Official Text" approved by the Code's sponsoring organizations, the National Conference of Commissioners on Uniform State Laws and the American Law Institute, states that this section "rests on the recognition of the fact that the essential purpose of a contract between commercial men is actual performance and they do not bargain merely for a promise, or for a promise plus the right to win a lawsuit and that a continuing sense of reliance and security that the promised performance will be forthcoming when due, is an important feature of the bargain."
[3] Repudiation envisioned by this section is explained in Comment 1 to the "Official Text" as "an overt communication of intention or an action which renders performance impossible or demonstrates a clear determination not to continue with performance." Comment 2 states that "[r]epudiation can result from action which reasonably indicates a rejection of the continuing obligation." The jury was not instructed about this anticipatory repudiation.
[4] Under Miss. Code Ann. § 75-2-501 identification of goods occurs when existing goods are designated or agreed upon as the goods to which the contract refers, which happened in the instant case at the time the contract was signed.
[5] Ross claims in its rebuttal brief that it requested such a peremptory instruction, but our examination of the record shows that such request was only by "proposed" instructions filed before trial commenced. In fact, the record shows that the peremptory instruction as to those three defendants was marked "withdrawn."