520 So.2d 1327 (1987)
Oscar P. LaBARRE and Huette A. Barber
v.
Harvey A. GOLD and John Bell.
No. 56625.
Supreme Court of Mississippi.
September 16, 1987.
Rehearing Denied March 16, 1988.
*1328 Landman Teller, Teller, Chaney & Rector, Vicksburg, for appellants.
Joe Lee, Lee & Grenfell, Jackson, for appellees.
EN BANC.
HAWKINS, Presiding Justice, for the Court:
This case comes before us after we remanded the case for retrial in Gold v. LaBarre, 455 So.2d 739 (Miss. 1984). On remand the chancellor awarded a joint and several money judgment against Oscar LaBarre and Huette Barber for $48,760.00 plus $25,731.84 interest accumulated from the date of entry. LaBarre and Barber appeal that judgment. Finding no error, we affirm.

FACTS
The facts of this case are unusual. The problems began in the early '70s when Huette Barber and Norman Fields agreed to trade a 16-acre tract of land. At Barber's request, Fields retained title to both parcels of land until Barber told Fields what to do with Barber's parcel.
Barber's plan was to remain the "real owner" of the land while using "straw men" to hold record title to the parcel. In this way Barber sought to avoid any judgments held against him and attachment by creditors. On February 7, 1979, Fields transferred record title of Barber's parcel to Henry Harrell. Harrell borrowed money from the Bank of Vicksburg by pledging the record title as security for a loan. Barber used the proceeds of this loan to raise money for his used car business.
In February, 1980, Barber found he needed more money to purchase cars for his used car business. Barber thought he could fix up the house on the property and sell the house and land for a profit. Barber went to his accountant, Alex Gold, for help in securing another loan. Alex Gold called John Bell, an individual, prospective lender. Bell told Gold that while he would not loan the money to Barber, he would loan it to Gold.
On February 14, 1980, Bell took $46,000.00 to Alex Gold's office. Because Alex Gold was in poor health, the parties planned to use Gold's son, Harvey Gold, to hold title for Barber. Harvey Gold signed a note for $48,760 to Bell and held title for Barber's benefit. Bell was to receive 10% interest on the $48,760 note, plus an additional $7,500 when the "Barber" property sold.
The following day Harrell, Barber, Alex Gold, Oscar LaBarre met in LaBarre's law office. At the meeting Harrell transferred the property to Harvey Gold and LaBarre and Barber dispersed the $46,000.00; $37,966.53 of which was used to pay off the loan Harrell made to the Bank of Vicksburg; $7,500.00 of the money was given to Harvey Gold to repair the house on the property; $500 was given to Harvey Gold for serving as Barber's title holder. LaBarre signed a receipt in Barber's behalf to Harvey Gold for the $37,966.53.
Later LaBarre issued a certificate of title which camouflaged the fact that Barber was the true owner of the property. LaBarre wrote Gold informing him that he had applied for title insurance for Gold and thanked Gold "for the opportunity to be of service."
After the meeting on February 15, Alex Gold was unable to negotiate a loan for Barber or sell the house. After ten months Alex Gold approached a real estate broker, Johnny Jabour, to help him move the property. Jabour agreed to become the next record holder and obtained an $80,000.00 loan on the property for which he would receive $10,000 up front as well as a 6% commission on the ultimate sale of the *1329 property. Jabour also agreed to allow Barber to live in the house pending its sale if Barber paid the interest on the loan and the taxes and insurance on the property.
At his father's direction, on April 6, 1981, Harvey Gold went to LaBarre's office, signed a deed conveying the property to Jabour, and left the deed with LaBarre for delivery at the closing the following day.
Because Jabour knew of Gold's and Bell's interest in the transaction, Jabour told Bell and Gold that the loan on the property would be closed at 3:00 p.m. at the American Bank on April 7, 1981. Despite this notice Bell and Gold failed to appear at the closing.
The next day James Cole, president of the American Bank, LaBarre and Jabour met at Cole's office at the bank to close the loan. Jabour transferred the title to the bank for its trustee. The bank, in turn, issued an $80,000.00 check payable to LaBarre and Jabour.
The parties left Cole's office and Jabour told Barber and LaBarre that he would call Gold to find out how much Gold was owed. Jabour could not reach Gold so he called Bell. Jabour handed the phone to LaBarre who wrote down the amount Bell was due on a slip of paper. After LaBarre got off the phone, Jabour asked LaBarre to go back to LaBarre's office to make out checks for everyone. LaBarre responded, "Huette's (Barber) got too many judgments against him, he wants it to be done in cash." So the parties went to a teller and Jabour and LaBarre signed the check. LaBarre took the $80,000.00, gave Jabour $10,000.00, kept $800.00 for his fee and gave the remainder to Barber, who put the money in a bank bag. LaBarre told Jabour that they were going to take the money down to Harvey Gold's office within 30 minutes and pay him off. The next day Harvey Gold called LaBarre and asked him, "Where is Barber?"
Neither Harvey Gold nor Bell received any of the proceeds of the $70,000.00 which Barber and LaBarre received at the bank.
Alex Gold's father died and Harvey Gold remained liable to Bell for the promissory note. As a result Harvey Gold brought suit against the American Bank; Landman Teller, Jr., the bank's trustee; attorney Oscar LaBarre; Johnny Jabour; and Huette Barber. The bank, as trustee, and Jabour were dismissed as to both the monetary judgment against them and any claim affecting their title. The suit was reduced to the issue of conversion of Gold's money by LaBarre and Barber. After remand by this court, the chancellor awarded a money judgment to Bell and Gold. LaBarre and Barber appealed that judgment.

LAW

DID LABARRE AND BARBER CONVERT THE PROCEEDS RECEIVED FROM THE SALE OF THE HOUSE FROM GOLD AND JABOUR?
We remanded this case to determine whether Gold's funds retired the indebtedness that existed on the property on February 15, 1980. Resolution of this issue necessarily determines whether Gold had an interest in the "Barber" property.
Where a grantee retains title to land and holds it for the benefit of another in order to secure a loan made by the grantee, the conveyance is a mortgage. The mortgage "is evidenced by a deed absolute (and the grantee) is entitled to retain title until payment of the claim for which it is held for security." Osborne, Mortgages, § 91 (1970). See also Medders v. Ryle, 458 So.2d 685 (Miss. 1984); Conner v. Conner, 238 Miss. 471, 119 So.2d 240 (1960).
The chancellor found that John Bell delivered $46,000 to Alex Gold and Harvey Gold, and that Alex Gold and Harvey Gold in turn lent the money to Huette Barber. He found Gold's loan was evidenced by a receipt for $37,966.53 dated February 15, 1980, which LaBarre signed for Barber's benefit. Further, the chancellor found: "The balance of the money was put into a special account and was paid by Mr. Harvey A. Gold and Mr. Alex Gold to pay for work being done on the house ..."
On appeal the appellant argues that Barber, not Bell, was the source and owner of *1330 funds which were the subject of LaBarre's receipt to Gold. True, in their testimony, both LaBarre and Barber denied any knowledge of Bell's loan to Gold for Barber's benefit. The chancellor, however, had ample evidence on which to base his finding.
Gold, Bell and Jabour all contradicted LaBarre's claim of ignorance as to the source of the money. LaBarre could not sufficiently explain why he signed a receipt to Gold for $37,966.53 on February 15, 1980. Moreover, these transactions arose because Barber needed money for his used car business. If Barber already had the money to retire the indebtedness on his property as he now claims, he did not need the Golds to participate in the transaction.
Because Gold had an interest in the "Barber" property, he also had an interest in the proceeds resulting from the sale of the property. Although Gold's security interest was not evident on the face of the deed, his interest can be converted by one having actual knowledge of his interest in the property. Ross Cattle Co. v. Lewis, 415 So.2d 1029 (Miss. 1982); Mississippi Motor Finance v. Thomas, 246 Miss. 14, 21, 149 So.2d 20, 24 (1963). There is little doubt that Barber and LaBarre knew of Gold's interest. Barber initiated the transactions and Gold helped negotiate them.
Conversion results from conduct intended to affect an owner's interest which is inconsistent with the owner's rights. In order to maintain an action for conversion, the defendant must have acted so as to deprive the plaintiff of his interest. Masonite Corp. v. Williamson, 404 So.2d 565, 567 (Miss. 1981); Mississippi Motor Finance v. Thomas, 246 Miss. at 20, 149 So.2d at 23.
The day before the closing, Harvey Gold deeded the property to Jabour and relied on LaBarre's promise to pay him for his interest with the proceeds on the sale. On April 7, 1981, LaBarre and Jabour met with James Cole, president of the American Bank, at Cole's office to transfer title and close a loan. At trial Jabour, the only disinterested party, testified that he was aware of the real nature of the transaction when he purchased the "Barber" house and was concerned that neither Bell nor Gold would receive the proceeds from the sale. Jabour told the court what happened at the loan closing:
Q. Who was it (the check) payable to?
A. Johnny Jabour and Oscar LaBarre, an attorney.
Q. When you received the check, what did you do with it?
A. Well, I never received it. Mr. LaBarre gave it to me to sign, and he was going to disperse the funds.
Q. And were those funds dispersed?
A. I do not know that, whether they were dispersed or not. They told me they were going to go by and pay off somebody, Mr. Gold.
Q. They told you they were going to go by and pay off Mr. Gold?
A. Yes, sir. I think the check was cashed and that $10,000 was given to me, and the other money was given to Mr. Barber.
Q. All right, sir. Did you question the cashing of the check at the bank?
A. I just thought he was going to disperse by the check. I made a statement to that (effect). Other than that, I did not question it.
Q. You thought he was going to disperse it by the check? What do you mean?
A. Well, all loan closing I have been to they have been dispersed by check.
Q. While you were there did you make any phone calls?
A. Yes, sir. I did.
Q. Who did you call?
A. I called John Bell and told him they were closing the loan out and that Mr. Barber was bringing the money, or either Mr. LaBarre by Harvey Gold's office.
Q. Why did you call John Bell.
A. Because John Bell notified me that he had lent some money to Harvey Gold on the house.

*1331 Q. Were you aware of the outstanding indebtedness?
A. Right.
Vol. II, pp. 164-165.
Despite LaBarre's assurances that Gold would be paid, he allowed Barber to abscond with the proceeds from the sale. Barber and LaBarre had notice of Gold's interest in the proceeds from the sale to Jabour, and they acted with the intent to deprive Gold of his interest. Thus Gold and LaBarre are liable for conversion.
LaBarre suggested that he cannot be liable for conversion because he was only representing Barber in the transactions. In its previous decision the Court reminded LaBarre an attorney has a responsibility to disclose that he represents only one of the participants of a multi-person transaction which is fraught with the probability of conflicting interests. By notifying the other participants of the true situation, they are able to take reasonable steps to protect themselves. Gold v. LaBarre, 455 So.2d at 748; Mississippi Code of Professional Responsibility, EC 5-14 (1971).
While an attorney cannot be held liable to third parties for his actions made in furtherance of his role as counselor, he has a duty to refrain from committing tortious acts against third parties. "... Admission to the bar does not create a license to act maliciously, fraudulently or knowingly to tread upon the legal rights of others." (Cites omitted.) Newburger, Loeb & Co., Inc. v. Gross, 563 F.2d 1057, 1080 (2nd Cir.1977). See also Giuliani v. Chuck, 620 P.2d 733, 736-737 (Hawaii Ct.App. 1980).
The fact that LaBarre's client received the benefit of LaBarre's tortious act will not relieve LaBarre of liability for conversion.
There was nothing in the defendant's status as an attorney for ... (his client) which made it his duty to pay to his client money which he knew, or must be charged with having known, belonged to the plaintiff. (Cites omitted) The defendant had complete control over the money. It was his duty to hold for the plaintiffs so much of the proceeds ... as represented the plaintiff's known interest in it.... Defendant received the entire sum in the first instance and thereupon became accountable to the plaintiff for the part of the money of it as received. (Cite omitted) He could not relieve himself of that accountability by making an unauthorized payment of the whole sum to (his client)... .
General Exchange Insurance Corp. v. Driscoll, 52 N.E.2d 970, 973 (Mass. 1944).
LaBarre was instrumental in defeating Gold's right to the proceeds of the Jabour sale. LaBarre helped negotiate the transactions. He told Jabour and Gold he would distribute the proceeds to extinguish Barber's debt to Gold. Because of this promise and because LaBarre served as the only attorney closing the transactions, Gold entrusted LaBarre with complete control over the proceeds of the sale. Despite LaBarre's notice of Gold's interest, he gave all but $10,800 of the $80,000 to Barber. Thus, LaBarre as well as Barber is liable for conversion.

CAN LABARRE AND BARBER INVOKE THE DOCTRINE OF CLEAN HANDS AGAINST HARVEY GOLD?
Barber and LaBarre argue that Gold and Bell cannot recover in equity because they were parties to a transaction designed to defraud Barber's creditors.
Harvey Gold, however, was not aware of the true nature of the transaction. He was unaware of the judgments against Barber, and was not present when the parties met to plan the transaction on February 15, 1980. He signed the note, held title, and deeded the property to Jabour solely at his father's request. Now Harvey Gold remains liable to Bell on a promissory note.
Barber and LaBarre ask us to invoke the doctrine of clean hands to prevent Gold from recovery. This would allow them to profit from their deception.
The doctrine of clean hands "is not invoked for the benefit of parties to fraudulent transactions ..." Thigpen v. Kennedy, 238 So.2d 744, 747 (Miss. 1970). It cannot apply to the only innocent party to these transactions who would bear the loss *1332 caused by Barber's and LaBarre's conversion. Thus, the chancellor was correct in holding that the appellants LaBarre and Barber could not invoke the doctrine of clean hands. See Crabb v. Comer 190 Miss. 289, 200 So. 133 (1941).

CAN BARBER AND LABARRE USE THE USURY STATUTE TO AVOID PAYMENT OF A DEBT WHICH GOLD INCURRED FOR BARBER'S BENEFIT?
Bell loaned Gold $46,000 for which Harvey Gold signed a $48,760 note. Gold in turn loaned the $46,000 in cash to Barber. When the property sold, Bell was to receive the $48,760 at 10% interest in addition a $7,500 profit from the sale of the property. All the parties expected to sell the house within a year. Thus, Bell would receive $15,136 [(48,760 - 46,000) + 4,876 + 7,500 = 15,136] for the use of his money which calculates to be 31% interest on a one-year note. Thus, Bell's loan was usurious to Gold. Miss. Code Ann. § 75-17-1 (Supp. 1985).
LaBarre and Barber, however, cannot utilize usury as a defense against Harvey Gold. Usury is a personal defense which is only available to the debtor. Chandlee v. Tharp, 161 Miss. 623, 137 So. 540 (1931). In this case Bell loaned the money to Gold. Thus, the defense of usury is only available to Gold against Bell. More importantly,
(the usury) statute protects and safeguards the borrower by penalizing sharply the lender in the usurious contract; that it is not meant to give the borrower an unjust advantage of the lender. Its good purpose should not be perverted to a source of legal fraud by borrowers upon lenders. The statute provides a severe penalty or forfeiture of the principal and all interest for its violation and should be strictly construed, [quoting from Byrd, et al. v. Newcomb Mill & Lumber Co., 118 Miss. 179, 79 So. 100, 101 (1918)].
Fry v. Layton, 191 Miss. 17, 2 So.2d 561 (1941).
The case of Crabb v. Comer, 190 Miss. 289, 200 So. 133 (1941), demonstrates this Court's application of the usury statute in a similar factual situation. In Crabb the defendant admitted that he converted the plaintiff's property, but claimed he would not be financially liable for his wrongdoing because his transaction with the plaintiff was usurious. The Court rejected the defendant's argument holding: "It is one of the oldest maxims of the law that no man shall, in a court of justice, take an advantage which has his own wrong for the foundation for that advantage." Id. at 190 Miss. at 296, 200 So. 133.
Barber seeks to invoke the usury statute to avoid payment of a debt which Gold incurred for Barber's benefit. All these transactions were designed to allow Barber to live in and make a profit from a sale of the property and at the same time avoid attachment by his creditors. Barber and LaBarre also plead the usury defense to avoid liability for conversion and in turn enable Barber to retain the proceeds from the sale of the house. Applying the rule that no man should profit from his own wrongdoing, we find that the lower court did not err in dismissing the usury defense.

DID THE TRIAL COURT ERR IN AWARDING PREJUDGMENT INTEREST AGAINST THE APPELLANTS?
The chancellor awarded the plaintiffs, Bell and Gold, interest at a rate of 10% from 2-15-80 until the trial date. The court reasoned that on 2-15-80 Gold's funds retired the indebtedness that existed on the "Barber" property. The appellant argues that prejudgment interest is improper because the damages are not based upon any contract nor for any liquidated sum and that 8% is an was the legal rate of interest, making a 10% improper.
An award of prejudgment interest rests in the discretion of the awarding judge. (Cites omitted) Under Mississippi law prejudgment interest may be allowed in cases where the amount due is liquidated when the claim is originally made, or where the denial of the claim is frivolous or in bad faith. (Cites omitted)
*1333 Aetna Casualty & Surety Co. v. Doleac Electric Co., 471 So.2d 325, 331 (Miss. 1985.)
While the appellant correctly points out that legal rate of interest on notes is 8%, see Miss. Code Ann. § 75-17-1 (Supp. 1985), the judge awarded the 10% interest based upon the rate agreed to by the parties. Bell loaned Gold money at 10% interest for Barber's benefit. The judge found that Barber and LaBarre knew of and agreed to this indirect loan to enable Barber to avoid the wrath of his creditors. Thus, the chancellor correctly awarded 10% interest until the time of trial and 8% legal interest from the time he entered judgment.
AFFIRMED.
WALKER, C.J., ROY NOBLE LEE, P.J., and DAN M. LEE, PRATHER, ROBERTSON, SULLIVAN, ANDERSON and GRIFFIN, JJ., concur.