# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2021-CA-00666-SCT

*KAREN REES McGEE*

*v.*

*COMPREHENSIVE RADIOLOGY SERVICES,*
*PLLC*

| | |
|---|---|
| DATE OF JUDGMENT: | 05/18/2021 |
| TRIAL JUDGE: | HON. RHEA HUDSON SHELDON |
| TRIAL COURT ATTORNEYS: | WILLIAM V. WESTBROOK, III |
| | LES W. SMITH |
| | JOHN BURLEY HOWELL, III |
| | ANDREW ROBERTS NORWOOD |
| | J. ROBERT RAMSAY |
| | WILLIAM J. LITTLE, JR. |
| | ORVIS A. SHIYOU, JR. |
| COURT FROM WHICH APPEALED: | FORREST COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | WILLIAM J. LITTLE, JR. |
| | WILLIAM JARRETT LITTLE |
| ATTORNEY FOR APPELLEE: | J. ROBERT RAMSAY |
| NATURE OF THE CASE: | CIVIL - TORTS-OTHER THAN PERSONAL INJURY & PROPERTY DAMAGE |
| DISPOSITION: | AFFIRMED - 06/09/2022 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE KING, P.J., MAXWELL AND GRIFFIS, JJ.**

**MAXWELL, JUSTICE, FOR THE COURT:**

¶1.    Karen McGee was the president of a collections agency. When her company ran into financial trouble, she directed her business administrator to delay remitting the money it had collected for Comprehensive Radiology Services, PLLC. Meanwhile, the agency still billed

for—and received commissions on—the money collected. When McGee's scheme was finally discovered, her company had withheld almost $800,000 of Comprehensive Radiology's money. McGee was sued for conversion and fraud. And the chancellor found her individually and personally liable to the radiology group for $785,549.71.

¶2. Because the record supports the chancellor's finding McGee converted $785,549.71 of Comprehensive Radiology's funds, we affirm. On appeal, McGee argues she could not have committed conversion because, as a matter of Mississippi law, funds collected and deposited into a bank account cannot be the subject of conversion. But this is not so. While the tort of conversion cannot be used to recover a mere debt, it can be used to recover identifiable money belonging to the plaintiff. And that is what happened in this case. The money McGee's company collected for Comprehensive Radiology was identifiable and undeniably belonged to the radiology group. So Comprehesive Radiology's funds were the proper subject of a conversion claim. McGee's company had no right to keep this money to cover its own expenses but instead was obligated to remit it at the end of the month in which it was collected. By directing her employee to delay remittance of Comprehensive Radiology's money, McGee committed conversion and is thus liable to Comprehensive Radiology for $785,549.71.

### Background Facts & Procedural History

### I. Service Contract

¶3. McGee was the president of Network Services, Inc. Network Services collected accounts receivable for third parties in exchange for a commission. One of their larger clients was Comprehensive Radiology, a radiology group in Hattiesburg, Mississippi.

¶4. While McGee testified that Network Services would simply deduct its commission from the funds collected for many of its clients, that was not the agreement between Network Services and Comprehensive Radiology. Instead, according to the contract between Network Services and Comprehensive Radiology, Network Services was obligated to remit to Comprehensive Radiology at the end of each month *all* money collected for the radiology group that month. And based on the amount collected, Comprehensive Radiology was, in turn, to pay Network Services a commission within ten days.[1]

¶5. What this looked like practically is as follows: Network Services would deposit any money it collected for Comprehensive Radiology—as well as its other clients—into a bank account at Trustmark Bank, which the company referred to as the "escrow" account.[2] Network Services' long-time business administrator, Lakesia Carter, testified[3] that each month she would issue a check from the Trustmark escrow account to Comprehensive

---

[1] Specifically, Section 1.1 of the service agreement between Network Services and Comprehensive Radiology provided: "Monies collected will be remitted to CLIENT MONTHLY with commission payment due ten (10) days after receipt of the end of the month statement."

[2] There was no record evidence that the account was set up at Trustmark as an actual escrow account. But McGee herself referred to it as an escrow account, and Network Services treated it as such, keeping the money collected on behalf of clients in this account while keeping its own operating funds in a separate account at a separate bank.

[3] At the time of trial, Carter was too ill to testify in person, so her deposition transcript was admitted.

Radiology for the exact amount collected. This check was delivered to Comprehensive Radiology in Hattiesburg.

¶6.     Each month, Network Services also prepared a separate commission statement for Comprehensive Radiology. This statement, essentially a bill, was emailed to Comprehensive Radiology's business manager, Mike Villonga, who worked remotely from Florida. Based on this statement, Villonga would write Network Services a commission check, which Network Services would deposit into its separate operating account at BancorpSouth.

## II.     Network Services' Late Payments

¶7.     According to Carter, in the early 2010s, Network Services' expenses began to exceed its income. These expenses included payroll for McGee and her daughter. They also included thousands of dollars in monthly rent for a commercial building that McGee and her sister owned individually.

¶8.     When Carter brought the company's shortfall to McGee's attention, McGee directed Carter to delay remitting to Comprehensive Radiology the money Network Services collected on its behalf. McGee also directed Carter to transfer money from the Trustmark escrow account to the BancorpSouth operating account.

¶9.     In both February and March 2011, Network Services did not remit the money it collected for Comprehensive Radiology. But Network Services still sent Villonga a monthly collection report and received commissions on the amounts it represented it had collected on behalf of the radiology group. Network Services finally remitted February's collections in April 2011 and the March collections in May 2011. Network Services continued to fall

4

further and further behind in payments. By 2014, Network Services was more than a year behind in remitting the collections to the radiology group. In other words, instead of remitting the money collected at the end of each month—as the contract required—Network Services was remitting each month the amount collected thirteen months earlier. Network Services persisted in these late payments for several years. For example, in May 2017, Network Services remitted to Comprehensive Radiology the amount collected in April 2016.

¶10. All the while, Network Services sent monthly collections reports. But these reports were based on the real-time collections, and Network Services continued to receive commissions tied to the amounts collected—and not the amounts untimely remitted. During this same time period, Network Services continued to pay McGee, her daughter, and her sister.

¶11. By the time Comprehensive Radiology discovered the discrepancies between collections and remittances in May 2018, Network Services was behind in turning over approximately $800,000 in Comprehensive Radiology collections. When Comprehensive Radiology confronted McGee, she immediately acknowledged what happened. In a letter from McGee to Comprehensive Radiology, McGee apologized "for having failed your trust in my company and for the major delinquency in remitting your payments." McGee proposed a payment plan. According to her plan, Network Services would pay Comprehensive Radiology its money over the course of four years.

### III. Comprehensive Radiology's Lawsuit

5

¶12. In July 2018, Comprehensive Radiology sued Network Services and McGee individually to recover the alleged $811,140.53 Network Services collected between April 2017 through March 2018 but did not remit to Comprehensive Radiology. The action was filed in the Chancery Court of Forrest County. The complaint sought injunctive relief and breach of contract damages against Network Services. It also alleged tort claims of conversion and fraud against Network Services and McGee. Network Services filed for bankruptcy, staying the case against it. But Comprehensive Radiology proceeded with its conversion and fraud claims against McGee individually.

¶13. A bench trial was held in November 2020. At the conclusion, the chancellor ruled that McGee was individually liable to Comprehensive Radiology for $785,549.71. Specifically, the chancellor found McGee had committed both conversion and fraud.

¶14. Regarding conversion, McGee had admitted Network Services owed Comprehensive Radiology approximately $811,000, which had been deposited into the Trustmark account—an account McGee described as an escrow account. But these funds were never the property of Network Services. The contract between Network Services and Comprehensive Radiology specified that Network Services would remit *all* collections to Comprehensive Radiology monthly. Yet, at McGee's direction, Carter did not remit these funds. Instead, she transferred them to Network Services' operating account at BancorpSouth. In turn, these funds were used to pay McGee, her daughter, and her sister. The chancellor concluded McGee's actions constituted conversion—that is, "an intent to exercise dominion or control over goods, which is inconsistent with the true owner's right."

*Walker v. Brown*, 501 So. 2d 358, 361 (Miss. 1987) (citing *Miss. Motor Fin., Inc. v. Thomas*, 246 Miss. 14, 149 So. 2d 20 (1963)).

¶15. Regarding fraud, the chancellor found McGee made false representations to Comprehensive Radiology—namely, the monthly collection reports—on which Comprehensive Radiology relied to pay commissions to its detriment. At the same time Network Services was reporting to Comprehensive Radiology the amount it had collected that month, McGee was directing Carter not to remit that amount to Comprehensive Radiology. She directed Carter instead to divert those funds to Network Services' operating account. For example, in January 2017, Network Services reported that it had collected $88,227.81 for Comprehensive Radiology, for which the radiology group promptly paid Network Services a $23,265.02 commission. But Network Services only remitted $54,546.31—the amount Network Services had collected for Comprehensive Radiology thirteen months earlier in December 2015. The chancellor found this to be fraud.

### IV. McGee's Appeal

¶16. McGee timely appealed the final judgment against her, asserting three claims:

(1) This case is nothing more than a breach of contract, for which McGee, as corporate officer, cannot be held individually liable.

(2) No false representations were made—both the collection reports and delayed remittance reports were accurate. So there was no fraud.

(3) Money cannot be the subject of conversion.

¶17. To the extent McGee challenges the chancellor's factual findings, this Court will not disturb those findings "unless manifestly wrong or clearly erroneous." ***Consol. Pipe &***

*Supply Co. v. Colter*, 735 So. 2d 958, 961 (Miss. 1999) (citing *Denson v. George*, 642 So. 2d 909, 913 (Miss. 1994)).  But we review the questions of law she raises de novo.  *Id.*

## Discussion

### I.      Can McGee be held personally liable?

¶18.    McGee asserts she cannot be held *personally* liable for Network Services' debts.  And, indeed, McGee is correct to the extent she cannot be held individually liable to Network Services' creditors merely because she is the company president.  *See*, *e.g.*, *Turner v. Wilson*, 620 So. 2d 545, 548 (Miss. 1993) ("[I]ndividual liability of corporate officers or directors may not be predicated merely on their connection to the corporation . . . .").

¶19.    But she *can* be held liable for her own wrongdoing.  *Id.*  In Mississippi, "the general rule is well established that when a corporate officer directly participates in or authorizes the commission of a tort, even on behalf of the corporation, [s]he may be held personally liable." *Miss. Printing Co. v. Maris, West & Baker, Inc.*, 492 So. 2d 977, 978 (Miss. 1986) (citing *First Mobile Home Corp. v. Little*, 298 So. 2d 676 (Miss. 1974); *Grapico Bottling Co. v. Ennis*, 140 Miss. 502, 106 So. 97 (1925)).  This rule applies to the tort of conversion, "as where money or property of a third person is in the hands of the corporation and the officers in control knowingly and intentionally convert it by refusing to give up possession, or by applying it to the uses of the corporation." *Wilson v. S. Cent. Miss. Farmers, Inc.*, 494 So. 2d 358, 361 (Miss. 1986) (quoting 19 C.J.S. *Corporations* § 849).  This rule also applies to fraud.  *Little*, 298 So. 2d at 679 (holding that a corporate officer "is individually liable for

8

fraudulent acts of h[er] own or in which [s]he participates" (quoting 19 Am. Jur. 2d *Corporations* § 1384 (1965))).

¶20. Here, the chancellor did not simply hold McGee personally liable for the money Network Services owed Comprehensive Radiology.[4] Instead, the chancellor determined that McGee herself acted tortiously, injuring Comprehensive Radiology. So the controlling question on appeal is whether the law and record support the chancellor's conclusions.

### II. Can money be converted?

¶21. In addressing this question, we need not go any further than analyzing the chancellor's finding of conversion, or civil theft. While the chancellor determined McGee committed *two* torts—conversion and fraud—a finding of conversion alone is sufficient to make McGee liable to Comprehensive Radiology for the entire $785,549.71 judgment, without having to delve into the question of fraud.

¶22. Conversion, or civil theft, "requires an intent to exercise dominion or control over goods which is inconsistent with the true owner's right." *Walker*, 501 So. 2d at 361. McGee argues that, as a matter of law, conversion is not actionable as to funds deposited in a bank account.[5] McGee relies on *Mossler Acceptance Co. v. Moore*, 218 Miss. 757, 67 So. 2d 868,

---

[4] We note that this is not a case in which Comprehensive Radiology sought to "pierce the corporate veil"—i.e., it did not ask the court to ignore the legal separateness of Network Services due to some abuse on McGee's part of the corporate form. *See Canadian Nat'l Ry. Co. v. Waltman*, 94 So. 3d 1111, 1116 (Miss. 2012) (listing elements of a corporate-veil-piercing claim).

[5] Comprehensive Radiology insists that McGee waived this legal argument by failing to raise it in the trial court. But the record shows McGee *did* bring this issue to the chancellor's attention, asserting in her proposed findings of fact and conclusions of law that "conversion applies to tangible property or cash, not funds in a bank account." While

9

873 (1953), which quotes hornbook law that "[c]onversion lies only for personal property which is tangible." *Id.* (quoting 53 Am. Jur. *Trover and Conversion*, § 4). McGee then relies on a *non-conversion* case, *Cartwright v. Deposit Guaranty National Bank*, 675 So. 2d 847, 848 (Miss. 1996), for the proposition that money deposited in a bank account is *intangible* personal property. Splicing these two cases together, McGee contends conversion cannot apply to money because it is intangible personal property. She insists the only way this Court can affirm the chancellor's finding that she converted Comprehensive Radiology's money is by overulling both *Mossler* and *Cartwright*.

¶23. We disagree.

¶24. *Cartwright* is inapposite. The question in that case was whether funds deposited in an account met the statutory definition of exempt personal property under Mississippi Code Section 85-3-1 (1972)—a statute wholly inapplicable to this case. *Cartwright*, 675 So. 2d at 847. *Mossler*, by contrast, was a conversion case. *Mossler*, 67 So. 2d at 872-73. But as Comprehensive Radiology points out, since *Mossler*, this Court has affirmed judgments based on the proceeds of a sale of land, *LaBarre v. Gold*, 520 So. 2d 1327, 1331 (Miss. 1987), and based on the conversion of a ward's funds by a conservator, *Bryan v. Holzer*, 589 So. 2d 648, 659 (Miss. 1991). Neither *Labarre* or *Bryan* overruled *Mossler*, strongly indicating that *Mossler* did not hold that money can never be the subject of conversion. In fact, in *Mossler*, we explained that "[a]n action will not lie for the conversion of a *mere debt*

McGee may not have made the precise argument she makes in her brief—namely, that to hold her liable for conversion would require this Court overrule precedent—she did sufficiently bring this issue to the trial court's attention to warrant appellate review of her claim.

10

*or chose in action.*" **Mossler**, 67 So. 2d at 873 (emphasis added) (quoting 53 Am. Jur. *Trover and Conversion*, § 5). In **Mossler**, a creditor failed to timely probate its claim against the debtor's estate. **Id.** at 871. So it tried to dodge the time bar by trying to recover the debt through a conversion claim. **Id.** at 872. But according to the **Mossler** Court, "where there is no obligation *to return identical money*, but only a relationship of debtor and creditor, an action for conversion of the funds representing the indebtedness will not lie against the debtor." **Id.** at 873 (emphasis added) (quoting 53 Am. Jur. *Trover and Conversion* § 5). So **Mossler** did not hold that money can never be the subject of conversion, as McGee contends. Rather, **Mossler** held that a conversion action cannot be used to recover a mere debt.

¶25.     Here, Network Services was not merely Comprehensive Radiology's debtor. Instead, under the contract's terms, all the money Network Services collected for Comprehensive Radiology belonged to Comprehensive Radiology. And Carter testified that she knew, as business administrator, that the funds collected belonged to the radiology group, not Network Services. This is why the funds were deposited into the escrow account, which was separate from the Network Services operating account. While other clients' funds were also deposited into the Trustmark escrow account, the money collected for Comprehensive Radiology was easily identifiable. In fact, McGee *singled out* Comprehensive Radiology's funds. As Carter testified, McGee specifically directed Carter not to remit Comprehensive Radiology's collections. Yet other clients continued to receive their money.

¶26.     These facts are similar to those confronted by the Court of Appeals of Arizona in **Case Corp. v. Gehrke**, 91 P.3d 362 (Ariz. Ct. App. 2004). There, the plaintiff, Case Corporation,

11

had entered an agreement with a company, of which the Gehrkes were officers. *Id.* at 363-64. Per the agreement, Case provided the Gehrkes' company with heavy machinery to sell in exchange for a security interest in the equipment. *Id.* If the Gehrkes' company sold any Case equipment, it had to remit to Case its share of the proceeds within seven days. *Id.* at 364. The Gehrkes sold Case machinery, commingling the proceeds from the sale of Case Corporation's inventory with proceeds from non-Case sales. *Id.* But the Gehrkes never paid Case its share of the proceeds within seven days. Instead, their company defaulted and filed for bankruptcy. *Id.*

¶27. Case sued the Gehrkes personally for conversion. *Id.* at 364. The Gehrkes moved for summary judgment, arguing—like McGee does—"that non-specified and unsegregated funds could not be the subject of a conversion claim." *Id.* The trial court agreed and granted the Gehrkes summary judgment. *Id.* But the Arizona Court of Appeals reversed. *Id.* at 365-68. While Case conceded that it never required the proceeds from the sale of its equipment be placed into a separate bank account and not be commingled with non-Case proceeds, Case did have a security interest in the proceeds. *Id.* at 367. And this security interest "allow[ed] the proceeds to be identified even when they are commingled with other funds . . . ." *Id.* at 368. Thus, the appellate court held that Case had "assert[ed] a viable claim for conversion of its secured proceeds of the inventory." *Id.*

¶28. Again, the money Network Services collected for Comprehensive Radiology, though placed in the Trustmark escrow account with other clients' funds, was identifiable. So it could certainly be the subject of conversion, just like the ward's funds in *Bryan*, 589 So. 2d

at 659, and the land-sale proceeds in *LaBarre*, 520 So. 2d at 1331. As we have said, conversion involves the defendant's "unlawful assumption of dominion over the personal property involved, in defiance or exclusion of the plaintiff's rights, or else a withholding of the possession under a claim of right or title inconsistent with that of plaintiff." *Thomas*, 149 So. 2d at 23. And there is record support for the chancellor's determination that McGee directed Carter to withhold remitting funds to which Comprehensive Radiology had a right under the service agreement. We affirm the $785,549.71 judgment based on the chancellor's finding McGee committed conversion.

¶29. **AFFIRMED.**

**RANDOLPH, C.J., KITCHENS AND KING, P.JJ., COLEMAN, BEAM, CHAMBERLIN, ISHEE AND GRIFFIS, JJ., CONCUR.**